**Jane C. VOLLMERT, Plaintiff–Appellant,**

v.

**WISCONSIN DEPARTMENT OF TRANSPORTATION, Defendant–Appellee.**

No. 98–3673.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1999.

Decided Nov. 24, 1999.

**294**

A. Steven Porter (argued), Porter, Jablonski & Associates, S.C., Madison, WI, for Plaintiff–Appellant.

Karen E. Timberlake (argued), Department of Justice, State of Wisconsin, Madison, WI, for Defendant–Appellee.

Before POSNER, Chief Judge, and CUDAHY, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Jane Vollmert had been an employee of the Wisconsin Department of Transportation (the "Department") for twenty-one years when her division acquired a new computer system. In her position, she processed applications for special license plates for disabled persons and organizations serving the disabled. She herself suffers from disabilities including dyslexia and learning disabilities, and had difficulty learning the new computer system. Ultimately, she was transferred from her position to another division which did not provide the same opportunities for promotion. She filed this suit claiming that the Department failed to reasonably accommodate her disability. The district court held that she was not a person who was "qualified" for the job under the Americans with Disabilities Act (ADA) because she had failed to demonstrate that she could meet the demands of the job with accommodations. Accordingly, the district court granted summary judgment to the Department.

## I.

When the new computer system was introduced, Vollmert worked in the special plates unit. That unit handled the processing of documents such as vehicle title and registration applications, special license plates, and identification cards for disabled persons and organizations that

worked with the disabled. The processing of disabled ID cards was a priority, and the total turnaround time was not expected to exceed one day. Roughly 95% of Vollmert's time was devoted to processing the cards. Prior to July 1994, she did so by checking the application for accuracy; determining what type of card was needed, such as permanent, temporary or one for an organization; entering data from the application into a database; typing and laminating the card; and preparing the card for mailing.

In July, a new computer system was installed which replaced the mainframe system with a network of personal computers employing Windows-based rather than text-based software. At the same time, the Department developed new applications for disabled ID cards that were compatible with the new computer system and incorporated changes in state law. With the new system, Vollmert was still required to ascertain whether the application was complete and correct. She then entered information into the new Windows-based software, generally working with information on four screens. For applications by organizations, she had to enter the customer database and create a record. The new system required her to exercise more judgment in order to reconcile inconsistencies among the application, the software requirements, and the department's databases.

Once the new computer system was installed, the Department began to use the new applications, but many of the old application forms remained in general circulation. As a result, the Department continued to receive applications using the old forms even as it was training its employees on the new system. The Department assigned Vollmert to process the old applications that were still arriving, and the other employees were allowed to work exclusively with the new computer system. Vollmert also received training on the new system at that time. In July 1994, she attended a 2–hour class conducted by the

system's designer. The next month, Kevin Huggins, one of Vollmert's supervisors, learned from Vollmert's co-workers that she was experiencing some difficulties with the new computer system, was not processing her share of the applications on the new system, and was failing to process difficult applications. He then gave her the less complex and less time-sensitive applications to process.

Around the same time, Vollmert notified upper management, including section chief Tanya Ayres, that she was not receiving adequate training on the new system. She informed Ayres that her coworkers were receiving more individualized instruction from Dennis Barr, the computer expert assigned to the special plates unit for the transition. In late August, Vollmert met with Huggins, Ayres, Barr and Lois Gartland, a lead worker in the unit, to discuss the situation. Huggins explained to Vollmert why she was required to continue working on the old system, and stated that she would need to continue to do so. Regarding the new system, it was agreed that: Barr would provide one-on-one training with her starting from the beginning and demonstrating all steps to process applications on the new system; during the training, applications would continue to be sorted so she would receive those commensurate with her skills; she would write down questions to minimize her tendency to re-ask questions; and she would refer questions only to Huggins, Barr or Gartland, permitting her supervisors to track her progress and reducing the potential for disruption of her co-workers.

During the month of September, Barr met with Vollmert on at least four occasions for periods of time ranging from ten minutes to an hour each time, thus providing a total of between forty minutes and four hours of one-on-one training for that month. During that time he demonstrated the system, answered questions, or simply watched her operate the computer. He provided print-outs of various screens to Vollmert as a reference, and compiled a

training manual for her. Barr found that she was eager to learn the system and at times appeared to have mastered it, but on other days she seemed to have forgotten tasks she once could complete.

Barr continued to train her in October and November, and Vollmert progressed to the processing of organizational applications, which were more complex. Vollmert continued to ask basic and repetitive questions, however, and Barr concluded that she had not mastered some basic concepts of the system. On more than one occasion, Huggins responded to Vollmert's questions by telling her to refer to her notes. During this period, Barr also timed Vollmert's processing of the applications. He determined that she could complete a basic application in 60 to 75 seconds if she encountered no problems, which was an acceptable rate. Her overall completion rate, however, was lower than her coworkers, although their skills were probably more developed because they worked exclusively on the new system. By March 1995, Vollmert was processing 67 new applications a day, whereas her co-workers could process 50 to 60 in two hours.

Vollmert suffers from a number of medical conditions that impeded her progress in learning the new system. She has bilateral adhesive capsulitis, also known as frozen shoulders, which is a condition in which inflammation of the shoulder joint results in stiffness. In September 1994, when the training was taking place, she began receiving physical therapy three times a week which later increased to five times weekly. She used sick leave to attend those appointments, and Huggins adjusted her work station to minimize her physical problems. Moreover, as a result of a childhood head injury, she has a seizure disorder. Finally, she has a long-standing neuro-cognitive disorder, delays in verbal intelligence, and deficits in basic skills, learning and memory functions that together result in dyslexia and learning disabilities.

A number of progress assessments led to Vollmert's transfer from the special files unit. In December 1994, Vollmert met with Barr and Huggins to discuss her work performance and was given a subpar performance evaluation, even though it was not time for her annual review. When asked whether she believed there was further training that might help her, she was unable to provide any ideas. She responded in writing to her performance evaluation, listing many of her medical conditions and requesting reasonable accommodation. A January meeting with Vollmert, her union representative, Huggins, and Ayres yielded minor adjustments, including additional training regarding organizational applications. Around the same time, Vollmert provided the Department with a letter from Dr. Austin R. Woodard who had evaluated Vollmert in February 1993. In the letter, Dr. Woodard stated that Vollmert retained well information that she had known for a long period of time, but had difficulty remembering new information on a day-to-day basis. Dr. Woodard further wrote that Vollmert was likely to be much slower in learning new information and work-related skills, and that she would require specialized instruction to accomplish the learning.

Eventually, Huggins set new performance standards for Vollmert that were below that of other workers, including the requirement that she process twelve applications an hour. She was able to process just over ten an hour and continued to ask basic questions about the system; in addition, she had a higher error rate than her co-workers. In April 1995, the union president wrote a letter on Vollmert's behalf requesting that a specialist be brought in to assist in her training. Such learning disability specialists were available at no cost from the Wisconsin Department of Vocational Rehabilitation. Ayres denied the request because she believed Vollmert had received adequate training for several months from Barr, and because she felt the benefits of a tutor trained to instruct persons with disabilities had to be bal-

anced against the benefits of having help from Barr with his expertise in computers.[1]

In April 1995, Ayres gave Vollmert an ultimatum. She could remain in the special files unit conditionally, but if her performance did not improve in 3–4 months, she would be subject to termination. In the alternative, she could transfer to the title file unit at her same classification and salary. She accepted the transfer under protest that her disabilities had not been accommodated. Her new position was at level MVR–2 and did not allow for the possibility of promotion, whereas her co-workers in the special files unit received promotions to the next classification, MVR–3, and ultimately to MVR–4, with corresponding pay increases.

## II.

■ Vollmert eventually sued under the ADA arguing that the Department failed to reasonably accommodate her disabilities, and that she was subjected to harassment because of her disabilities. We need not tarry on the second issue because it is devoid of merit. We note first that this circuit has not yet expressly decided whether the ADA encompasses claims of hostile work environment or harassment, as are common under Title VII. *Silk v. City of Chicago*, 194 F.3d 788, 803–04 (7th Cir.1999). Thus far, we have assumed the existence of such claims, without expressly deciding whether they are proper, because resolution of that issue has not been necessary. *Id.* That is because no case thus far has presented claims of harassment significant enough to rise to the level of a hostile environment were that type of claim available, *Id.*, and this case is no different. The only allegations of harassment are that Barr berated and criticized her for her problems stemming from her disability. As examples of alleged harassment, Vollmert states that Barr became frustrat-

ed when she continued to have difficulties with the new system, he warned another employee not to "be a Jane" when she made a stupid mistake, and he criticized Vollmert for asking repetitive questions. The employer denies that the statement referred to Jane Vollmert, but we assume that it did for summary judgment. Nevertheless, it falls well below the requirement of a hostile environment, in that it is neither severe nor pervasive. *Id.* at 804–05; *Faragher v. City of Boca Raton*, 524 U.S. 775, ——, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) ("to amount to a hostile workplace environment, the harassment must be 'so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment.'" [citations omitted]) The district court properly granted summary judgment to the Department on that issue.

We are left then with the failure to accommodate claim. The district court held that Vollmert failed to demonstrate that she was a "qualified individual with a disability." 42 U.S.C. § 12112(a)–(b). The ADA defines that term as an "individual with a disability who, with or without accommodation, can perform the essential functions of the employment positions that such individual holds or desires." 42 U.S.C. § 12111(8); see also 29 C.F.R. § 1630.2(m) (1998). The Department argued that Vollmert was not a qualified individual because she was incapable of performing the essential functions of the job with the new computer system. Those essential functions included the "prompt, accurate processing of disabled ID card applications," which generally encompassed the expectation that applications be processed within a day. The Department further identified the skills needed for her position as including the use of a personal computer mouse, navigation of the Windows-based software and department data-

---

**1.** This is puzzling because the two are not mutually exclusive. A learning disabilities specialist presumably would work with the

Department supervisors such as Barr to develop training materials and methods that are effective given her disabilities.

bases, and exercise of judgment concerning the entry of data.

Vollmert recognized that she had not yet demonstrated a proficiency in those skills, but attributed the shortcomings to the Department's failure to provide training tailored to her dyslexia and other learning disabilities. She contended that with proper training she could master those skills. In support, Vollmert introduced a report from vocational rehabilitation expert Kevin L. Schutz. In that report, Schutz concluded to a reasonable degree of certainty that with appropriate training, Vollmert could become proficient in the new skills required of the position, including the computer skills. Relying on this court's decision in *Weigel v. Target Stores*, 122 F.3d 461 (7th Cir.1997), the district court concluded that the expert opinion was not entitled to any weight because it was conclusory. Because Vollmert presented no other evidence that she could perform the essential functions of the job with reasonable accommodation, the court granted the Department's motion for summary judgment.

 The central issue in this appeal, then, is whether the expert report by Schutz was sufficient to raise a genuine issue of fact regarding Vollmert's ability to perform the job with accommodations. The parties do not dispute that the expert report was admissible evidence. That determination, however, is not dispositive of the summary judgment motion because the court must consider the weight of the evidence, not just its admissibility. On a few occasions, this court has recognized that an admissible expert report may not be sufficient to preclude summary judgment where it offers nothing but naked conclusions. *Weigel*, 122 F.3d at 469; *Mid–State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989). For an expert report to create a genuine issue of fact, it must provide not merely the conclusions, but the basis for the conclusions. *Id.*

For instance, in *Weigel*, the plaintiff brought an action under the ADA alleging discrimination because of her depression disability, and offered an affidavit from a psychologist in an effort to prove that she was a "qualified individual." 122 F.3d at 468. The psychologist opined that "to a reasonable degree of medical certainty ... following a medical leave of absence commencing on February 25, 1994, there was a good chance that Shirley Weigel could have returned to her position as a cashier supervisor." *Id.* Missing from the affidavit, however, was any justification for that conclusion. We held that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process, and his 'naked opinion' does not preclude summary judgment." *Id.* at 469, quoting *American Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir.1996) (Posner, C.J., dissenting). In fact, even a review of the psychologist's deposition in *Weigel* did not reveal "any seeds of justification" for his opinion. 122 F.3d at 469. Weigel argued that the opinion was based upon the psychologist's years of experience and his treatment and diagnosis of Weigel. *Id.* We rejected that argument because there was no evidence as to what in that educational and experiential background supported his opinion. The psychologist did not discuss depression in general or Weigel's past responsiveness to treatment, and did not attempt to reconcile his opinion with her inability to return to work after an initial five-month leave. *Id.* Therefore, the court was left with no basis upon which to credit the psychologist's opinion, and upheld the grant of summary judgment to defendant.

We reached a similar conclusion in *Mid–State*. 877 F.2d 1333. In that case, an economist submitted an affidavit on behalf of Mid–State that recited that he had examined documents and pleadings in the case and provided his conclusions. *Id.* at 1338–39. For example, he stated: "[i]n my opinion the loan arrangement, which in this case included a locked box or blocked account, in this case was not necessary to

assure repayment of the loan by Mid–State." *Id.* at 1339. This same format was used for his other opinions, and no facts or basis for the conclusions were provided. *Id.* A sentence at the end merely attributed his opinions to his "education, training and experience" and his review of the documents. *Id.* Thus, the court had nothing from him but the bottom line, with no facts and "no hint of an inferential process." *Id.* Accordingly, we held that the affidavit was insufficient to create a genuine issue of fact because it was devoid of any facts or reasoning underlying the conclusion. *Id.* The court further noted that the affidavit was especially unreliable because the conclusions made no sense from the standpoint of economics. *Id.* at 1339–40.

Those cases illustrate the type of situations in which an expert opinion will be insufficient to create a triable issue of fact. The present case is not of the same metal. The expert in this case, Schutz, provided far more evidence of the factual basis for his conclusion. An examination of the expert report in this case reveals that Schutz provided the facts upon which the opinion was based, and identified the particular facts deemed important to his decision.

Schutz based his expert opinion on Vollmert's narrative account, education, prior work experience, and the results of aptitude tests which he administered to her. His opinion that she could acquire proficiency with the new computer system with proper training was based upon information gleaned from those sources. For instance, her personal history revealed that her primary difficulties related to the acquisition of new information quickly, and difficulty in learning new information that was presented in a written format. Once a skill was learned and used on a regular basis, she had in the past demonstrated proficiency with relatively complex tasks. Her educational background further indicated that her learning disability adversely impacted the speed rather than ability to acquire information. She completed a community college program in business operations, but it took her 2 years rather than the usual 1½ years for the program. In addition, he reviewed her prior work experience. She began working for the Department in 1972 as a typist, and was promoted in 1987 to the MVR–2 classification. Her position involved computer data entry, examining documents, comparing records and documents, updating address and owner information, determining plate types, communication with co-workers and supervisors, some contact with the public, and other miscellaneous administrative and clerical duties. The specific tasks and responsibilities in the job description for her position were quite consistent with her report of her duties. Finally, all past performance evaluations were positive except the one in early 1995. This work experience supported Schutz' conclusion that she was capable of adapting to the new requirements of the job.

In addition, Schutz administered the Peabody Individual Achievement Test—Revised (PIAT–R) and the General Aptitude Test Battery (GATB) to Vollmert. The PIAT–R yielded scores in reading, math, and spelling consistent with a person with learning disabilities. Schutz reported that the results were below average but certainly functional for basic written correspondence and general clerical and administrative tasks. The GATB results ranged between average and below average. In spite of her neurological and learning disability problems, she demonstrated average range performance for numerical aptitude, spacial aptitude, form perception, and clerical perception. Moreover, Schutz noted that her performance on the clerical perception subtest was at the high end of the average range (73%), which revealed a significant strength for activities or job tasks involving attention to detail, organization skills, ability to perceive differences in written or tabular material, ability to quickly perform tasks such as sorting, collating or entering information into grids or other routine and complex clerical han-

dling functions. He further observed that many of the essential functions of her job required clerical perception.

Based on that evidence, Schutz reached his conclusion. He found that with additional time, support and work, Vollmert had been able to overcome her learning difficulties, that her primary difficulties related to method and speed at which she acquired new skills, and that historically she was able to acquire necessary skills to work at a high level of productivity and efficiency. He recognized that a number of factors had negatively impacted her ability to learn the new computer system, including: her difficulty in breaking down the information presented because of her learning disabilities; distracting shoulder pain during the training period and the resultant need to miss work almost daily for physical therapy; and the method of training, by someone unskilled in learning disabilities. Schutz concluded that based on the test results, interview and records, Vollmert had special needs regarding skill acquisition and learning but had demonstrated an ability to become proficient with relatively complex tasks given time and the proper environment. He determined that the training environment in 1994 did not meet that standard. The training guide presented information which, from a reading perspective, was of a quite complex nature. Schutz stated that an individual training someone with a learning disability would likely substantially modify the information presented in the guide, particularly given that Vollmert's primary learning difficulties come from acquiring information that is presented in a written or verbally complex format. Moreover, the training she received was of a sporadic nature, whereas intense initial training would have been appropriate. Schutz noted that the test results indicated clear strengths for clerical and administrative work, and aside from difficulty acquiring

new information quickly, she had a number of vocational assets and strengths that suggested strong potential for that type of work. A review of her job descriptions revealed that she currently was proficient in most if not all required areas.[2] Therefore, Schutz concluded that with appropriate training, it was his opinion to a reasonable degree of certainty that for any areas that she is not currently proficient, she has the ability to acquire the necessary skills.

Thus, Schutz reached his conclusion based on information gleaned from Vollmert's educational and work history, test results, and her interview. He documented how each of those sources provided support for his conclusion that she had the aptitude and ability to acquire the knowledge given proper training and time. That is simply not the type of "naked conclusion" that we found lacking in *Mid–State* and *Weigel*. In fact, at oral argument, the Department acknowledged that the problem with Schutz' report was not that he did not discuss the evidence he considered and not that he omitted the factual underpinning for his conclusions, because he did. Rather, the Department complains that Schutz provided "a mountain of facts on one side and the conclusion on the other, and gave no roadmap as to how he got there." As has been discussed, the expert did connect the facts with his conclusion. The test results and educational and work history demonstrated her ability to acquire new information and to handle complex tasks, particularly those involving clerical perception, provided that she is given appropriate training and sufficient time. If the Department disagrees with the conclusion drawn from those facts, it can present its own evidence to rebut it. The report is sufficient to establish the reasoning underlying the conclusion.

■ In demanding a "roadmap," the Department would require an expert to

2. Schutz also stated that Vollmert had told him she presently had mastered the computer system, which is unsupported by affidavit. Schutz' conclusion that she had the capacity to learn the new system was not premised upon that representation, although it did provide further support for his conclusion. Therefore, we disregard it for our analysis.

not only provide the justification for the opinion, but also to give a primer on why the facts allow the expert to reach that conclusion. That requires too much of the plaintiff to avoid summary judgment. It is akin to requiring a radiologist not just to present the X–Ray and her diagnosis, but to explain why the X–Ray allows her to arrive at that conclusion. The X–Ray itself provides the basis for her conclusion, and that is sufficient to entitle the diagnosis to weight. A person seeking to challenge it can easily do so by having another radiologist read the X–Ray. Similarly, Schutz presented the evidence underlying his conclusion, and explained how he deemed that evidence relevant to his conclusion. An expert need not conclusively establish a fact and need not answer all potential challenges to the opinion in order for his opinion to be given weight in a summary judgment proceeding. A contrary holding would require an expert to provide the analysis, not just the basis, for an opinion.

Nor is the conclusion of Schutz at odds with the evidence on which he relies, or contrary to common sense or experience such that one could question whether any connection between facts and conclusion exists. *See Mid–State*, 877 F.2d at 1339–40 (noting that the expert opinion was not only unsupported by facts and reasons but made no sense). The facts in this case reveal training that, although apparently well-meaning, was hardly tailored to a person with learning disabilities. Instead of being allowed to immerse herself in the new system, Vollmert was required to work on the old system at the same time as she was to learn the new system. She was provided one-on-one training, but that may not have even encompassed more than four hours in the month of September. At the same time, she was regularly missing work for physical therapy. She was provided a training manual and visual material, but Schutz noted that the written information was presented in a complex manner and that she learned poorly in that manner. Finally, she was deterred from asking repetitive questions; she was only allowed to ask them of her supervisors, and was on more than one occasion referred to her notes in response. Repetition, consistency, and the presentation of the material in diverse formats are critical for learning disabled persons to successfully assimilate information. *See generally* Smith, Ph.D., Corinne and Strick, Lisa, LEARNING DISABILITIES A TO Z (1997), at 159; Hallahan, Daniel P. et al., INTRODUCTION TO LEARNING DISABILITIES (1996) at 161–67. Despite these obstacles, Barr noted that at times she appeared to have mastered the new system, although she would later require reinforcement of some basic concepts. Her progress is consistent with the prediction of Dr. Woodard who evaluated Vollmert in February 1993. Dr. Woodard stated that information Vollmert knew for a long period of time would be well retained, but that she had significant difficulty remembering new information on a day-to-day basis. Dr. Woodard further stated that Vollmert would need specialized training to learn new work skills, and that she would have the greatest difficulty when the information was presented in a written form and when she had to listen to oral instruction without the benefit of visual information or demonstration. Even with the training deficiencies, Vollmert was making progress in learning the new system. Therefore, we cannot say that the facts identified by the vocational expert are unrelated to or contradict his conclusion. A contrary holding would effectively prohibit an expert from extrapolating from a given set of facts to form a conclusion regarding the ability of the person to succeed in a related area. Schutz need not rely on evidence specifically focused on computer proficiency to give an opinion whether Vollmert could succeed in learning the new computer system. The facts he relied on in this case support his conclusion, and that is sufficient for summary judgment. Accordingly, the district court erred in requiring a more extensive affidavit.

The Department asks us to nevertheless uphold summary judgment by

finding as a matter of law that it provided a reasonable accommodation in transferring her, and alternatively that it did so by attempting to meet her training needs. We cannot agree. We have previously recognized that reassignment generally should be utilized as a method of accommodation only if a person could not fulfill the requirements of her current position with accommodation. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 497–98 (7th Cir.1996); *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 693–95 (7th Cir.1998). Schutz' report creates a genuine issue of fact regarding her ability to learn the new computer system with proper training. Therefore, the transfer to a position that did not involve the same opportunities for advancement was not a reasonable accommodation. Moreover, the training that was provided was not sufficiently designed to address the needs posed by Vollmert's disability. The Department was aware of Vollmert's dyslexia and learning disabilities since at least August 1994, and was specifically made aware of the need for specialized training by Dr. Woodard's letter in early 1995. Moreover, Vollmert explicitly requested a tutor trained in learning disabilities in April 1995, and Schutz indicated that such a trainer likely was available free of charge through the Division of Vocational Rehabilitation. The Department nevertheless failed to provide training geared toward her disability throughout that time. The Department may have been well-meaning in its efforts, but its attempts to accommodate her were not reasonable because they were not tailored to address the problems posed by her disability. Therefore, we decline to uphold summary judgment on that alternative ground.

For the above reasons, the decision of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.