**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**No. 19-1780**

_____

MICHAEL STEVEN WIRTES,

        Plaintiff - Appellant,

    v.

CITY OF NEWPORT NEWS,

        Defendant - Appellee,

    and

NEWPORT NEWS POLICE DEPARTMENT (Government Agency), Chief of Police; RICHARD MYERS, Chief of Police (Individual); STACY KELLY, Assistant Chief Kelly (Individual),

        Defendants.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  Lawrence Richard Leonard, Magistrate Judge.  (4:18–cv–00015–LRL)

_____

Submitted:  January 29, 2021                     Decided:  April 30, 2021

_____

Before GREGORY, Chief Judge, and WYNN and HARRIS, Circuit Judges.

_____

Vacated and remanded by published opinion.  Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judge Harris joined.

_____

Joshua L. Jewett, Aaron D. Siegrist, Julia A. Rust, PIERCE MCCOY, PLLC, Norfolk, Virginia, for Appellant. Adonica Baine, Darlene P. Bradberry, OFFICE OF THE CITY ATTORNEY FOR THE CITY OF NEWPORT NEWS, Newport News, Virginia, for Appellee.

———————————

WYNN, Circuit Judge:

Michael Steven Wirtes sued his former employer, the City of Newport News ("the City"), alleging that it failed to accommodate his disability in violation of the Americans with Disabilities Act ("ADA"). According to Wirtes, the City concluded that he could not perform the essential functions of his job as a detective and then offered him the options of either retiring early or accepting reassignment to a civilian position he did not want. Wirtes reluctantly retired early and then filed suit. The district court granted the City's motion for summary judgment, finding that because Wirtes was offered reassignment, he could not make out a prima facie failure-to-accommodate claim under the ADA.[1]

We vacate and remand for further consideration in light of our conclusion that it is generally inappropriate for an employer to unilaterally reassign a disabled employee to a position the employee does not want when another reasonable accommodation exists that would allow the disabled employee to remain in their current, preferred position.

## I.

The undisputed facts show that American police officers are often required to carry the tools of their trade on "heavy and uncomfortable" duty belts that officers wear around their waists. J.A. 73–74.[2] Nationwide, "[t]he problem of . . . duty belt discomfort is a significant health and safety issue for uniformed personnel," causing a range of maladies

---

[1] The parties consented to jurisdiction before a United States Magistrate Judge who oversaw the case below and issued the summary judgment decision we review here.

[2] Citations to "J.A.__" refer to the Joint Appendix filed by the parties in this appeal.

including back and hip pain and paresthesia, J.A. 75–76, the latter of which is "a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body," *Burton v. Parks*, No. 11-cv-14768, 2012 WL 3667967, at *2 n.1 (E.D. Mich. May 29, 2012) (citation omitted).

Wirtes was employed as a police officer with the Newport News Police Department ("Police Department") from September 1997 until September 2016. During that time, he wore duty belts supporting pepper spray, a gun with ammunition, a taser, a baton, handcuffs, a flashlight, a radio, and a body camera battery pack.

From 2006 through 2010, Writes felt increasing pain and discomfort when wearing his duty belt. In February 2011, Wirtes notified Police Chief James Fox that he had "permanent nerve damage called meralgia paresthetica, which caused discomfort, pain, numbness, and tingling to his waist, left leg, and thigh area, which was caused by the wearing of his police duty belt."[3] J.A. 413 (cleaned up).

In response, the Police Department asked Wirtes to undergo a fitness-for-duty evaluation, the stated purpose of which was to determine if his condition required accommodation under the ADA. That examination revealed that he suffered from left thigh meralgia paresthetica. The examination also found that "[f]unctionally, [Wirtes had] no motor/strength deficits that would prevent him from working as a police officer," that "[h]is

---

[3] *See Williams v. Maersk Line, Ltd.*, 450 F. Supp. 3d 242, 247 (E.D.N.Y. 2020) ("Neuralgia paresthetica, also referred to as meralgia paresthetica, is a condition characterized by tingling, numbness, and burning pain in the outer part of the thigh, and which is caused by compression of the lateral femoral cutaneous nerve at its exit from the pelvis.").

4

biggest limitation [was] his tolerance of [his] police duty belt," and that "[h]is ability to use a police duty belt [was] dependent on his tolerance to the paresthesias he states he has with it." J.A. 445.

A few months later, Wirtes informed the City that his meralgia paresthetica appeared to be permanent and that while he wished to continue serving as a police officer, his ability to wear a duty belt would be limited. He therefore asked the City for reassignment to a unit—like white collar crimes or traffic light enforcement—that would allow him to serve as a police officer without needing to wear the full duty belt. The City obliged. In September of 2011, Wirtes was transferred from a position as a patrol officer in Newport News's Central Precinct to the City's Records Unit.[4] During his time in the Records Unit, Wirtes wore a shoulder holster instead of a full duty belt.

In January 2014, Richard Myers replaced Chief Fox as head of the Police Department. That March, Chief Myers ordered Wirtes to be transferred to the North Precinct Property Crimes Investigation Unit to serve as a detective. This transfer was not bad news for Wirtes's meralgia paresthetica because at the time, property crimes detectives were permitted to wear "plain clothes" and were not required to wear duty belts. J.A. 779. Wirtes continued to wear a shoulder holster.

---

[4] The original plan was for Wirtes's assignment to the Records Unit to be temporary, after which he would take a position as a property-crimes detective. However, his assignment to the Records Unit was later converted into his regular position.

In August 2015, in response to reports that Wirtes was wearing "a type of belt that [went] around his waist [during] recent duties," the Police Department had him undergo another fitness-for-duty medical evaluation to determine whether he was able to wear a duty belt.[5] J.A. 463. The doctor who examined Wirtes found that he could not, and further concluded that he was "unable to perform assigned duties as a police officer due to an inability to wear the uniformed required duty belt . . . due to a medical condition." J.A. 468.

Around the same time, Chief Myers instructed Assistant Chief Stacy Kelly—Wirtes's supervisor in the Property Crimes Investigation Unit—to increase the number of officers patrolling Newport News. In response, Assistant Chief Kelly required the property-crimes detectives under his command to start wearing their uniforms and taking evening patrol shifts. These new responsibilities, to wear uniforms and to go on patrol, did not apply to all detectives in the city. For example, detectives in the Investigation Bureau were not subjected to these additional requirements.

The City also made two alterations to its human resources policies in the fall of 2015. First, it revised the job description for police officers to state that all officers "[m]ust be able to wear a standard issued duty belt with all applicable gear." J.A. 606. Second, it "revised its light duty policy . . . to limit . . . non-occupational light duty assignment[s]" to

---

[5] These reports arose after Wirtes informed a supervisor that he had dropped his service weapon after failing to secure his gun to the belt he was wearing while executing a search warrant. While the record is not clear as to this point, it appears Wirtes was wearing a "regular belt" for "aesthetic purposes," not a duty belt. *See* J.A. 156.

eight months. J.A. 649. Following these changes, on November 9, 2015, Wirtes was put on light-duty status due to his alleged "inability [to] meet the essential job functions" of his position as a police officer. J.A. 675.

In June 2016, as Wirtes's allotted eight months of light-duty status drew to a close, the City wrote to him, noting that wearing a duty belt was an essential function of serving as a police officer. The City's letter also asked Wirtes to produce a list of potential accommodations or alternatives that would allow him to perform that essential function. In response, Wirtes restated that he could not wear a standard duty belt around his waist and requested the accommodation of relocating his equipment to a shoulder holster—the same type of holster he had been using since 2011. Wirtes also stated that he could add "a holster to [his] ballistic vest for . . . high risk assignments." J.A. 502. Alternatively, Wirtes proposed that he be exempt from the requirement to wear a standard uniform and from patrol duties.

In July, the City rejected Wirtes's proposal to wear his equipment on a shoulder or vest holster, citing "the need to be in full police uniform" and safety concerns. J.A. 524. It further rejected Wirtes's proposal to be exempt from performing patrol duties and from wearing the standard uniform, viewing these suggestions as unacceptable requests for a permanent light-duty assignment.

On July 26, the City offered Wirtes a civilian job as a logistics manager in charge of procuring supplies and vehicles for the Police Department. Wirtes rejected the offer, stating that he wished to continue working as a detective and explaining that he wanted a final decision on his accommodation request before transferring to a different job. The City later

7

emailed Wirtes to give him a final chance to accept the logistics manager position, setting a deadline of September 6 for him to choose between taking that civilian job or exercising his right to retire.[6]

On decision day, Wirtes wrote the City to suggest a salary increase for the logistics manager position. The City agreed, and Wirtes accepted the civilian position on September 7. But shortly thereafter, Wirtes wrote the City again, announcing his retirement—which he claimed was "forced under medical reasons"—and lamenting that the City and the Police Department "had chosen not to provide [a] reasonable accommodation based on [his] medical disability that would have allowed [him] to remain employed as a sworn police officer/detective." J.A. 491.

Wirtes, proceeding pro se, filed an original and first amended complaint against the City and related parties in February 2018. Then on April 24, 2018, he filed his second amended complaint—the operative complaint here—alleging that the City failed to accommodate his disability.[7] The City moved for summary judgment and the district court granted its motion. Wirtes timely appealed.

---

[6] Meanwhile, the City also tested Wirtes's proposed accommodation of attaching his firearm to his vest rather than to a holster around his waist. It concluded that attaching guns to vests would jeopardize officer safety, in part by making it easier for suspects to grab service weapons.

[7] Wirtes also brought a retaliation claim, which the district court later dismissed for lack of jurisdiction due to Wirtes's failure to raise the claim before the Equal Employment Opportunity Commission. On appeal, Wirtes does not challenge the dismissal of this claim.

## II.

"We review the district court's grant of summary judgment *de novo*, 'using the same standard applied by the district court.'" *Goodman v. Diggs*, 986 F.3d 493, 497 (4th Cir. 2021) (quoting *Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019)). "In doing so, we recognize that a court should grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Id.* at 497–98 (quoting *Brooks*, 924 F.3d at 111).

On appeal (and now represented), Wirtes primarily seeks reversal of the district court's grant of summary judgment on the grounds that it was inappropriate for the City to force him to choose between retiring or accepting reassignment to a position he did not want when a reasonable accommodation would have allowed him to maintain his desired position. Because such unilateral transfers are generally inappropriate when other accommodations would allow an employee to remain in their current position—something the district court assumed to be true here—and because the district court did not consider the disfavored status of involuntary reassignments, we vacate and remand for further consideration.

### A.

The Americans with Disabilities Act requires employers to make reasonable accommodations to "the known physical or mental limitations of an otherwise qualified [employee] with a disability." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020) (quoting 42 U.S.C. § 12112(b)(5)(A)). An employee is qualified if they "can perform the essential functions of the employment position [they] hold[] or desire[]," either "with or

9

without reasonable accommodation." *Id.* at 892 n.2 (quoting 42 U.S.C. § 12111(8)). Thus, "in order for a plaintiff to establish a prima facie case against his employer for failure to accommodate under the ADA, the plaintiff must show: '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodation.'" *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (cleaned up) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

The district court skipped over the first three elements of the prima facie claim before concluding that Wirtes could not satisfy the fourth element—that his employer refused to accommodate him—because the City offered him a position as a logistics manager.[8] The limited nature of the district court's opinion complicates our review because

---

[8] While the district court also listed other actions the City took over the years, *see* J.A. 871–72, some of the actions—like the City's efforts to "evaluate [Wirtes's] physical issues"—were not reasonable accommodations at all, s*ee Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) ("If an employee seeks to stay in his or her current job, the term reasonable accommodation means: 'Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position to [stay in the position].'" (alteration in original) (quoting 29 C.F.R. § 1630.2(o))). Other steps taken by the City, like temporarily placing Wirtes in the Records Unit, were not reasonable accommodations at the time Wirtes retired because they were no longer being offered. *See, e.g.*, *Ralph v. Lucent Techs., Inc.*, 135 F.3d 166, 171–72 (1st Cir. 1998) (explaining that the duty to provide reasonable accommodation "is a continuing one" that cannot be "exhausted by one effort"). Thus, the only plausible reasonable accommodation cited by the district court was the City's offer to reassign Wirtes to a position as a logistics manager.

10

the district court never determined what the essential functions of Wirtes's job were or which, if any, of his proposed accommodations could have permitted him to perform the essential functions of his job as a property-crimes detective—the specific position he desired within the Police Department.

We decline to determine in the first instance whether Wirtes could have performed the essential functions of his job either by wearing a shoulder holster or by being exempt from patrolling assignments and the duty-belt requirement. Instead, we assume for purposes of this appeal that Wirtes could have been reasonably accommodated in his job as a property-crimes detective through the implementation of either or both of his proposed accommodations.[9]

---

[9] Wirtes urges us to conclude that "[t]he district court's failure to consider" the parties' arguments related to the first three elements of a prima facie claim "constitutes reversible error." Opening Br. at 25. However, we have never adopted a blanket rule that district courts considering a motion for summary judgment are required to pass judgment on every element of an employee's prima facie case of disability discrimination. Requiring district courts to resolve each element *seriatim* when ruling on one element would be dispositive would only increase costs for litigants and waste judicial resources.

However, in the precise circumstances of this case, we agree with Wirtes in part. The district court did not explicitly find what the essential functions of Wirtes's desired position were or that there were no other reasonable accommodations available such that transfer was the only viable option. As discussed below, this was error. Thus, the practical effect of our ruling in this case will be that when an employer purports to accommodate an employee by reassigning them, district courts will need to consider whether other reasonable accommodations exist that permit the employee to perform the essential functions of their current position. Inherently, this inquiry will require district courts to consider what the essential functions of the position are before jumping to whether the employee was properly accommodated.

This leaves us with a narrow issue of law. Assuming the City *could have* accommodated Wirtes in his role as a detective, as the district court assumed without deciding, did it nonetheless appropriately accommodate him by offering to reassign him to a civilian logistics manager position? Stated more generally, does an employer "refuse[]" to reasonably accommodate its disabled employee, *Wilson*, 717 F.3d at 345, when it reassigns them against their will to a vacant position, despite the availability of a reasonable accommodation that would permit the employee to perform the essential functions of their *current* position? As set forth below, the answer, at least in the mine-run of cases, is yes.

B.

The ADA defines "reasonable accommodation" by way of an illustrative list of possible accommodations which may "include job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies . . . [,] and other similar accommodations." *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1011 (4th Cir. 2020) (emphasis altered) (quoting 42 U.S.C. § 12111(9)).

"[R]eassignment to a vacant position" thus admittedly "appears in the middle of [the ADA's] undifferentiated list of possible accommodations." *Id.* at 1014. But in our recent decision in *Elledge v. Lowe's Home Centers*, we joined other circuits and the Equal Employment Opportunity Commission ("EEOC") in recognizing that reassignment is the ADA's accommodation of "last resort," and indicated that reassignment should be held "in

12

reserve for unusual circumstances." *Id.* We based this conclusion on the guidance of the EEOC and our sister circuits as well as on the policy considerations underlying the ADA.[10]

In *Elledge*, we first explained that reassignment's "last among equals" status was "clearly attested [to] in the legal landscape." *Id.* For example, the EEOC has long advised that "[b]efore considering reassignment as a reasonable accommodation, employers should first consider those accommodations that would enable an employee to remain in his/her current position." EEOC, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act*, No. 915.022, 2002 WL 31994335 at *20 (Oct. 17, 2002).[11] The EEOC further explains that: "*Reassignment is the reasonable accommodation of last resort* and is required only after it has been determined that: (1) there are no effective accommodations that will enable the employee to perform the essential functions of his/her current position, or (2) *all other reasonable accommodations would impose an undue hardship* [on the employer]. *Id.* (emphases added). This undue hardship standard has been adopted by several circuit courts to explain that an employer is

---

[10] *Elledge*, like most reassignment cases, dealt with an employee who *wanted* to be transferred. 979 F.3d at 1008, 1013–14. Specifically, a director-level employee sought reassignment to either of two other available director-level positions at his company once he became physically unable to perform the essential functions of his position, and sued when his company declined to reassign him. *Id.* at 1007–08. We held that the reassignment the employee requested was not a reasonable accommodation because it would have required his employer to violate its best-qualified hiring system. *Id.* at 1013–16.

[11] "[W]hile not controlling upon the courts by reason of their authority, [EEOC Guidelines] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141–42 (1976)).

not obligated to reassign a disabled employee at the employee's request unless any other reasonable accommodation would pose an undue hardship to the employer.[12]

We then emphasized that treating reassignment as a "last among equals" respected the "core values underlying the ADA and employment law more generally." *Elledge*, 979 F.3d at 1014. We explained that the ADA's treatment of reassignment as a last among equals accommodation is a win-win-win for employers, disabled employees, and their coworkers. "Allowing other reasonable forms of accommodation to take precedence over reassignment" prevents either the employer or the disabled employee from unilaterally insisting upon reassignment to a vacant position. *Id.* It thus helps employers by "protect[ing] [their] discretion over hiring" for the open spot. *Id.* It helps employees by keeping them in their present job rather than "hurl[ing] [them] into an unfamiliar position." *Id.* And it protects the disabled employee's coworkers by "bolster[ing] th[eir] confidence . . . that the misfortune of a colleague will not unfairly deprive them of opportunities for which they themselves have labored." *Id.* Accordingly, we indicated that reassignment should be held "in reserve for unusual circumstances." *Id.*

---

[12] *See, e.g.*, *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1019 (8th Cir. 2000) ("[T]he very prospect of reassignment does not even arise unless accommodation within the individual's current position would pose an undue hardship [to their employer]." (internal quotation marks omitted)); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998) ("Generally, transfer or reassignment of an employee is only considered when accommodation within the individual's current position would pose an undue hardship [to their employer].").

*Elledge* thus established that reassignment is a disfavored accommodation that employers are generally under no *obligation* to offer. However, it did not address the question we now confront: Whether reassignment to a vacant position is a *permissible* accommodation under the ADA when the employee wishes to stay in their current position and can perform the essential functions of that position with reasonable accommodations.[13]

To answer this question, we take guidance from our sister circuits. Every circuit court to have addressed this issue has concluded that an employer fails to accommodate its qualified disabled employee when it transfers that employee from a position they could perform if provided with reasonable accommodations to a position they do not want.

In *Vollmert v. Wisconsin Department of Transportation*, the Seventh Circuit held that transferring a disabled employee to a position she did not want was not a reasonable accommodation when the employee could fulfill the essential functions of her current position if appropriately accommodated. 197 F.3d 293, 301–02 (7th Cir. 1999). In so holding, the Seventh Circuit emphasized that "reassignment generally should be utilized as a method of accommodation only if a person could not fulfill the requirements of her current position with accommodation." *Id.*

Similarly, in *Skerski v. Time Warner Cable Co.*, the Third Circuit found a genuine issue of material fact precluding summary judgment as to whether an employer reasonably

---

[13] As noted, *Elledge* involved an employee who wanted to be transferred. Likewise, the EEOC's guidance, and cases interpreting it, on when an employer is *required* to transfer an employee do not directly address the situation here where an employer seeks a transfer that the employee opposes.

accommodated an employee by transferring him to a position he did not want when he may have been able to stay in his current position with the help of an accommodation. 257 F.3d 273, 284–86 (3d Cir. 2001).

The Tenth and D.C. Circuits have also stated that employees generally should not be transferred if they can be accommodated in their current position, albeit in cases that did not feature an employee opposing an employer's efforts to accommodate them by transferring them to a position they did not want. In *Smith v. Midland Brake, Inc.*, the Tenth Circuit emphasized that "[w]hen an employer selects among several possible reasonable accommodations, the preferred option is always an accommodation that keeps the employee in his or her existing job if that can reasonably be accomplished." 180 F.3d 1154, 1170–71 (10th Cir. 1999) (en banc); *accord Davoll v. Webb*, 194 F.3d 1116, 1131 (10th Cir. 1999) ("[I]f possible[,] the employer should reasonably accommodate the employee within his or her existing job instead of reassigning him or her."). And drawing from the legislative history of the ADA, the D.C. Circuit has concluded that "Congress saw reassignment, as the EEOC does, as an option to be considered only after other efforts at accommodation have failed." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998) (en banc) (citing the ADA's House Report, which stated that "[e]fforts should be made . . . to accommodate an employee in the position that he or she was hired to fill before reassignment is considered" (citation omitted)). Meanwhile, it does not appear that any

circuit court has treated transferring an employee who wishes to remain in their current position and is qualified to do so as a reasonable accommodation.[14]

Considering this significant precedent from other circuits, the EEOC's guidance that employers should consider accommodating employees in their current position before considering reassignment, and our own explanation in *Elledge* that reassignment is a last-among-equals accommodation that should be held "in reserve for unusual circumstances," *Elledge*, 979 F.3d at 1014, we hold that an employer generally "refuse[s]" to accommodate its disabled employee for ADA purposes, *Wilson*, 717 F.3d at 345, when it unilaterally reassigns them to a vacant position instead of reasonably accommodating them in their current position.

To clarify, we do not hold that an employer can *never* reassign an employee when there exists a reasonable accommodation that will keep the employee in their current and preferred position. That broad question is not before us. Nor should this opinion be read in any way to restrict the ability of employers and employees to agree to a voluntary transfer.[15] Rather, we simply reiterate that reassignment is strongly disfavored when an employee can still do their current job with the assistance of a reasonable accommodation, and that

---

[14] *But cf. Warren v. UPS*, 518 F.3d 93, 100 (1st Cir. 2008) (declining to decide whether to adopt the principle articulated by the Tenth Circuit in *Smith*).

[15] While the EEOC treats reassignment as the "reasonable accommodation of last resort," it also advises that "if both the employer and the employee voluntarily agree that transfer is preferable to remaining in the current position with some form of reasonable accommodation, then the employer may transfer the employee." EEOC, *Enforcement Guidance*, 2002 WL 31994335 at *20.

reassignment should therefore be held "in reserve for unusual circumstances." *Elledge*, 979 F.3d at 1014.

## III.

We recognize that the district court lacked our guidance here and in *Elledge* when it found that the City reasonably accommodated Wirtes by offering to transfer him to the logistics manager position while apparently assuming that reasonable accommodations were available that would have allowed him to perform his essential functions as a detective. Nevertheless, we conclude that the district court erred in granting summary judgment to the City without considering the strongly disfavored status of reassignment as a reasonable accommodation when the disabled employee can still perform the essential functions of their current position, with or without reasonable accommodation. We vacate and remand for further proceedings consistent with this opinion.[16]

*VACATED AND REMANDED*

---

[16] Under our Local Rules, oral argument is normally required for publication of decisions. 4th Cir. R. 36(a). However, pursuant to Amended Standing Order 20-01, which temporarily waives that requirement, we have opted to decide this case by published opinion even though it was submitted on the briefs.