# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 7, 2024    Decided August 9, 2024

No. 22-5124

GHULAM ALI,
APPELLANT

v.

MICHAEL REGAN, ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01899)

*Daniel S. Volchok*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With him on the briefs was *Amy Lishinski* and *Allison Schultz*, appointed by the court.

*Ghulam Ali*, *pro se*, was on the briefs for appellant.

*Rosa M. Koppel* and *Carolyn Wheeler* were on the brief for *amicus curiae* the Disability Rights, Education, and Defense Fund, *et al*. in support of appellant.

*Johnny H. Walker*, *III*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Brian P. Hudak*, *Jane M. Lyons*, and *Sean M. Tepe*, Assistant U.S. Attorneys. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: MILLETT and PILLARD, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

Ghulam Ali has worked as a career Environmental Protection Agency ("EPA") economist since 1997. EPA had long been aware that Ali suffered from severe allergies and had provided him a workspace that for years had accommodated his health needs. Yet in 2011, EPA placed a worker known for wearing heavy perfume in the cubicle right next to Ali. Ali complained about the consequences to his health and ability to work. After agreeing that Ali's allergies were a disability that qualified for accommodation, EPA offered Ali a take-it-or-leave-it accommodation of 100% telework. Ali rejected that accommodation, sought to engage the EPA in accommodation discussions, and, when those efforts failed, filed suit under the Rehabilitation Act, 29 U.S.C. § 791.

Whether, under these circumstances, offering only 100% telework, with no in-office alternative, was a reasonable accommodation for Ali's disability depends on the resolution of myriad factual disputes. But the district court did not allow Ali's claim to reach a jury, instead concluding as a matter of law that Ali caused a breakdown in discussions with EPA and therefore bore sole responsibility for any failure to settle on an appropriate accommodation.

We reverse. We have previously held that an employee who renders an employer *unable* to provide an accommodation—say, by withholding relevant information that the employer requested—cannot complain that the employer denied a reasonable accommodation. *See Ward v. McDonald*, 762 F.3d 24, 31–32 (D.C. Cir. 2014). But Ali provided all the information that EPA requested. Ali also proposed accommodations, which EPA rejected or ignored. Then Ali, like EPA, rejected a proposed accommodation—one that would force him to leave the workplace permanently. The relevant question therefore is whether EPA's final proffered accommodation was reasonable. As to that question, there is ample record evidence that would allow a reasonable jury to rule for either party, making the district court's entry of summary judgment in favor of EPA improper.

## I

The Rehabilitation Act aims to "maximize opportunities for individuals with disabilities" to participate in "competitive integrated employment" and to "ensure that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities[.]" 29 U.S.C. § 701(b)(2)–(3). The Act aimed to combat discrimination against the "millions of Americans [who] have one or more physical or mental disabilities[.]" *Id.* § 701(a). As amended, the law recognizes that "disability is a natural part of the human experience [that] in no way diminishes" individuals' rights to "live independently[,]" "enjoy self-determination[,]" "make choices[,]" "contribute to society[,]" "pursue meaningful careers[,]" and "enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society[.]" *Id.*

The Rehabilitation Act's "basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." *Ward*, 762 F.3d at 28 (quoting *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993)). Those steps include implementing workplace accommodations for federal employees, whom the Rehabilitation Act, since 1992, protects according to the same "standards applied under" the American with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq. See* 29 U.S.C. § 791(f); *Ward*, 762 F.3d at 28.[1]

The ADA, for its part, prohibits most non-federal employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). One form of prohibited discrimination is to "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]" *Id.* § 12112(b)(5)(A).

Federal employees may sue to enforce their rights under the Rehabilitation Act. 29 U.S.C. § 794a(a)(1). To prevail, an employee must allege and prove that: (1) he is disabled, (2) his employer had notice of the disability, and (3) the employer denied his request for a reasonable accommodation. *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1307–1308 (D.C. Cir.

---

[1] Where relevant, this opinion accordingly cites ADA and Rehabilitation Act cases without distinction.

2010). The employee bears the "initial burden" of showing that a reasonable accommodation is possible. *Carter v. Bennett*, 840 F.2d. 63, 65 (D.C. Cir. 1988). Once that showing is made, an employer may still avoid liability by showing that the proposed accommodation would impose an "undue hardship" on the employer's operations. 42 U.S.C. §§ 12111(10)(A), 12112(b)(5)(A); *see* 29 U.S.C. § 791(f); *Barth*, 2 F.3d at 1189. An employer fully satisfies its statutory obligation by offering an accommodation that is reasonable, even if it is not the one preferred by the employee. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998).

Reasonable accommodations "include * * * making existing facilities used by employees readily accessible to and usable by individuals with disabilities[.]" 42 U.S.C. § 12111(9). They also include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.*

Equal Employment Opportunity Commission ("EEOC") regulations further specify that "reasonable accommodations" include "[m]odifications or adjustments to the work environment * * * that enable an individual with a disability who is qualified to perform the essential functions of that position," as well as "[m]odifications or adjustments that enable * * * [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by [the employer's] other similarly situated employees without disabilities." 29 C.F.R. §§ 1630.2(o)(1)(ii)–(iii).

In practice, "[w]hether an accommodation is 'reasonable'" is often a fact-intensive question "determined by a close examination of the particular circumstances." *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 896 (7th Cir. 1996); *see Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 385 (2d Cir. 1996) ("Whether or not something constitutes a reasonable accommodation is necessarily fact-specific * * * [and] must be [determined] on a case-by-case basis."). That is because "[f]ew disabilities are amenable to one-size-fits-all accommodations." *Ward*, 762 F.3d at 31.

Because an appropriate accommodation will often turn on specific facts concerning the employee's disability and the employer's workplace, the employee and employer frequently need to share information to find a workable solution. *Ward*, 762 F.3d at 31; *see* 29 C.F.R. § 1630.2(o)(3) (Employers may need "to initiate an informal, interactive process with the individual * * * in need of the accommodation * * * [to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). We have described this "interactive process" as "'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'" *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)); *see Mogenhan v. Napolitano*, 613 F.3d 1162, 1167 & n.4. (D.C. Cir. 2010) (similar).

EEOC guidance elaborates on the process of identifying a reasonable accommodation. In many cases, "the appropriate reasonable accommodation may be so obvious" that no "step-by-step" dialogue will be needed. 29 C.F.R. pt. 1630 app. § 1630.9. For instance, when "an employee who uses a wheelchair requests that his or her desk be placed on blocks to

elevate the desktop above the arms of the wheelchair and the employer complies, an appropriate accommodation has been requested, identified, and provided[.]'" *Id.*

In other cases, "neither the individual requesting the accommodation nor the employer can readily identify the appropriate accommodation" without dialogue. 29 C.F.R. pt. 1630 app. § 1630.9. In such cases, the EEOC guidance advises that the employer "should":

> (1) Analyze the particular job involved and determine its purpose and essential functions;
>
> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
>
> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
>
> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

*Id.*

While freely sharing information will often facilitate finding an appropriate accommodation, the withholding of information by an employee or employer may stymie such

efforts. Yet "[n]either party should be able to cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability." *Ward*, 762 F.3d at 32 (quoting *Sears, Roebuck & Co.*, 417 F.3d at 805). So if an employee withholds requested information that is relevant to determining the existence of a disability or the appropriate accommodation for it, that employee may bear responsibility for the breakdown of the interactive process, which would foreclose a failure-to-accommodate claim. *Id.* at 32–33 (affirming grant of summary judgment to employer where employee did not respond to repeated requests for medical information, such that "no reasonable juror could have found that the [employer], rather than [the employee], was responsible for the breakdown"); *Stewart*, 589 F.3d at 1307–1308 (employee could not mount failure-to-accommodate claim where employee resigned without ever providing requested medical information needed to document disability). By the same token, "an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA." *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 149 (3d Cir. 1998) (en banc).

## II

### A

Ghulam Ali works as an economist in EPA's Office of Science and Technology. He has long suffered from severe allergies that "may result in, among other things, bleeding,

itchy skin, rashes, face and arm swelling, as well as difficulty breathing, seeing, walking, and sleeping." J.A. 258.[2]

For about ten years, Ali worked in a private office at the EPA. *Ali v. McCarthy*, 179 F. Supp. 3d 54, 67 (D.D.C. 2016), *aff'd*, 727 F. App'x 692 (D.C. Cir 2018). But following an office reshuffling around 2007, Ali was temporarily allowed to work from home for a few months before being permanently moved to a cubicle.

Ali sued, claiming, among other things, that EPA failed to accommodate his allergies. *Ali*, 179 F. Supp. 3d at 61–63. Ali's failure to provide requested medical information, however, showed that he "voluntarily abandoned the interactive process," and doomed his reasonable-accommodation claim. *Id.* at 79–80.

Ali then returned to work in the cubicle without further incident for over four years. But in 2011, EPA moved a co-worker known for sporting particularly pungent cologne to the desk next to Ali. J.A. 6, 100. The cologne triggered Ali's allergies and also made another colleague nauseous. J.A. 6, 234.

On November 17, 2011, Ali emailed two supervisors about his allergic reactions and asked to be moved to a private office or a small conference room. Though Ali's email did not mention the heavily cologned colleague, one of the supervisors emailed back in less than an hour to ask if the co-worker's cologne was "the source" of the allergies, which Ali promptly confirmed. J.A. 235. Ali's supervisor also offered the "immediate remedy" of relocating Ali to an "unoccupied cube"

---

[2] In recounting the facts, we view the evidence in the light most favorable to Ali, as he is the party opposing summary judgment. *Mogenhan*, 613 F.3d at 1165.

in a different section, while she worked on a more "permanent solution." J.A. 235.

Ali responded that the new cubicle was also "very perfumy" and that other free cubicles were located near printers that separately triggered his allergies or had "problems of one kind or another." J.A. 236. He reiterated his request to "move to some sort of a room instead of a cubicle[,]" while also mentioning that "management" had told him that the heavily perfumed colleague would be moved if the cologne became an issue. J.A. 236.

EPA did not respond to Ali's email. Two months later, Ali formally requested an accommodation under the Rehabilitation Act based on his allergies, attaching multiple doctors' letters documenting his disability. When his supervisor twice asked for more current medical information, undisputed evidence shows that Ali promptly supplied it.

On June 21, 2012, EPA, in a letter signed by one of Ali's supervisors, Denise Hawkins, "determined [Ali] to be a person with a disability" based on his allergies. J.A. 205; *see* J.A. 206 ("Your exposure to various kinds of allergens that include not only environmental allergens but also volatile organic compounds and products like paint, petroleum derivatives, perfumes, any kind of fragrances or odors, and several other materials, can cause detrimental effects on your health and lead to chronic diseases like asthma, chronic dermatitis and severe effects on the immune system.").

The same letter stated that "[a]t this time I would like to meet with you to explore and discuss what accommodation, if any, may be effective[.]" J.A. 206. The letter advised that Hawkins, "[a]*fter* discussing th[e issue] with" Ali, would have "the authority to determine what reasonable accommodation, if any, will be offered." J.A. 206 (emphasis added). Then, "[a]t

the appropriate time," Hawkins would "submit an offer of reasonable accommodation" to Ali. J.A. 206.

Yet that same day—without meeting with Ali or engaging in any further discussion with anyone—Hawkins sent Ali a letter that "[a]pproved" Ali's request for an accommodation. The only accommodation offered was: "Permission to work at home full time." J.A. 208.[3]

Ali had not requested to work from home, nor spoken to anyone at EPA about potential telework. He later testified that EPA, at the time it made its offer, did not "know[] anything of what the situation is at my home." J.A. 71, H'rg Tr. 49:9–10. Ali, after all, had successfully worked in the office for the four years prior to the heavily perfumed colleague's arrival next to his cubicle.

Ali responded by letter to EPA's offer, stating that he had "thought about working from home" and that it was "not a good option." J.A. 213. He reiterated his request for a private room and proposed locations where one might be available. After receiving no response, Ali followed up by email on July 5th and July 11th to reiterate his request. There is no record of any response from EPA to those emails.

In subsequent months, Ali also tried speaking directly with Hawkins about the situation. Hawkins testified that she offered him support for working from home, such as by offering to supply him with a printer for home use, or allowing him to explore hybrid work options. Ali also told an Equal Employment Opportunity ("EEO") counselor that he had

---

[3] While both the letter and approval form are dated June 21, 2012, the record does not indicate whether they were delivered to Ali simultaneously.

advised Hawkins that he could not work from home because printing at home exacerbated his symptoms. EPA Br. 28–29.

Ali tried moving among cubicles, including ones farther from the heavily perfumed employee, but continued suffering symptoms. EPA also offered Ali an air filter, but Ali asserted that air filters had not sufficed to trap his allergens in the past, and so he continued to request a new office.

Ali also tried a different tack: He directly asked his co-worker to stop wearing cologne. But the co-worker refused. In addition, Ali sent follow-up emails in January 2013 identifying two purportedly empty rooms in a different division's office area and asking to be moved to them. EPA did not respond.

Finally, in March 2013, Ali sent an email complaining about a different colleague's "scented products" and asking that the colleague be moved. J.A. 241. An EPA supervisor responded five days later that Ali "ha[d] been offered a reasonable accommodation of 100% telework and ha[d] declined the offer." J.A. 241. The supervisor offered to "reopen that discussion if [Ali] would like to reconsider" telework, but argued that moving the colleague would not help because all the cubicles "share[] the same common space and recirculated air." J.A. 241. Ali responded that proximity to contamination mattered to his allergies and emphasized that he "would be glad to discuss or settle the issues." J.A. 241. It does not appear that EPA responded to that offer for further discussion. Ali continued sending emails as late as June 2014 reiterating his request for a contained room and identifying spaces he thought were available. J.A. 242.

**B**

Ali filed a formal complaint with EPA's Office of Civil Rights in September 2012 that alleged EPA denied him a

reasonable accommodation and asserted unlawful-retaliation, hostile-workplace, and other discrimination claims. At an agency hearing, Ali testified that he rejected the offer of 100% remote work for several reasons. He said, first, that he "didn't want to take a chance on that situation again" because the last time he had teleworked, "[l]awyers got involved." J.A. 70–71, Hr'g Tr. 45:8–46:4. Ali added, secondly, that his house was "not suitable for working from home" permanently because he lacked an "office space set up." J.A. 71, Hr'g Tr. 46:15–20. Third, he explained that he could "not print things" at home because he "get[s an] allergic reaction to emissions from printers[,]" and would have nowhere to go if that happened at home. J.A. 71, Hr'g Tr. 47:1–4. Finally, Ali explained that his job requires him to be "in touch with other people, talking to them, brainstorming and that sort of thing, and get[ting] some feedback from these people." J.A. 71, Hr'g Tr. 47: 13–19. Yet if he is excluded from working in the office, he "won't be able to go to the office" and "won't be able to become a team leader[]" or "communicate with other people." J.A. 71, Hr'g Tr. 47:6–9.

Hawkins testified that Ali's requested accommodation of a single office was impracticable because there were no vacant offices available in her division. *See* J.A. 104–105, Hr'g Tr. 181:5–182:22. Hawkins also said that telework "would be *more* effective than a private office" because there was "no evidence that the air inside an office would be any different from air circulating around a cubicle." J.A. 44. She commissioned an air-quality test that she said showed "no appreciable difference between the quality of the air in an office and in a cubicle." J.A. 103, H'rg Tr. 176:10–19.[4]

---

[4] The report found that "carbon dioxide, carbon monoxide, relative humidity and temperature readings" were all within

Hawkins also testified that "privacy issues" prevented her or other managers from asking that Ali's perfumed colleague stop wearing his cologne. J.A. 102, Hr'g Tr. 172:15–173:5.

The Administrative Law Judge ruled in favor of EPA, and the EEOC upheld that decision on appeal. J.A. 25.

**C**

Ali then filed suit *pro se*, alleging that EPA failed to accommodate his disability and discriminated against him in several ways. The district court granted EPA summary judgment on all claims. As to Ali's Rehabilitation Act claim, the district court concluded that Ali "failed to act in good faith during the interactive process" because he "rejected telework" without providing any explanation. J.A. 267–268.

Ali appealed, and EPA moved for summary affirmance. We summarily affirmed the district court's grant of summary judgment with respect to all claims other than those under the Rehabilitation Act. Order 1–2, Mar. 15, 2023.

**III**

The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

We review "grants of summary judgment *de novo*[.]" *Waggel v. George Washington University*, 957 F.3d 1364, 1371 (D.C. Cir. 2020). We view all evidence "in the light most favorable to the" nonmoving party and draw all reasonable

---

"acceptable ranges" both by the cubicle and in a private EPA office. J.A. 216–217. It also found that fungal levels were about twice as high in the cubicle area than the office, but that both levels were within generally acceptable ranges. J.A. 216–217.

inferences in that party's favor. *Id.*; *accord Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). Summary judgment may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## IV

The district court erred in dismissing this case on the ground that Ali had caused a breakdown in the interactive process. EPA never requested any information that Ali withheld, nor is there any evidence that Ali otherwise interfered with EPA's ability to fulfill its statutory obligation to offer a reasonable accommodation or to engage in discussions with him about a proper accommodation. Instead, this case turns on the reasonableness of EPA's proposed final accommodation, which it offered without first meeting with Ali to discuss accommodation options. On this record, answering those questions depends upon the resolution of disputed material facts that a jury must resolve. The district court's grant of summary judgment to EPA accordingly was in error.

## A

There is no dispute in this case that Ali is a qualified individual with a disability, or that Ali had been successfully working in a cubicle in the office for over four years before EPA moved the strongly scented employee next to him. As a result, the Rehabilitation Act required EPA to offer Ali a reasonable accommodation for his disability. 29 U.S.C. § 791(f); *see* 42 U.S.C. § 12112(b)(5)(A). So the only question in this case is whether, as a matter of law, EPA offered such an accommodation, or whether the reasonableness of the offered accommodation turns on the resolution of materially disputed facts and circumstances, and so must be resolved by a jury.

Yet the district court's decision centered around the interactive process between Ali and EPA and, in particular, found that Ali had caused it to break down. That framing, however, has confused a procedural means with the substantive accommodation ends mandated by the Rehabilitation Act.

Nothing in the Rehabilitation Act requires that employers or employees follow a specific process for identifying a reasonable accommodation, interactive or otherwise. Rather, EEOC regulations and our prior cases recognize that some kind of back-and-forth between employer and employee "*may* be necessary" to enable the employer "[t]o determine the appropriate reasonable accommodation[.]" 29 C.F.R. § 1630.2(o)(3) (emphasis added); *see Ward*, 762 F.3d at 31–32. That is because "[f]ew disabilities are amenable to one-size-fits-all accommodations." *Ward*, 762 F.3d at 31. And an employer will often need information about (i) the particular nature of an individual's disability, (ii) the effect of the disability, the workplace's design, or the employer's practices on the employee's ability to work productively, and (iii) the type of accommodation sought. That is information "typically possessed only by the individual or her physician." *Id.* at 31.

Employees, for their part, may need information about the employer's resources, capabilities, and successful past accommodation processes for analogous disabilities, as well as the impact of various accommodations on the proper functioning of the workplace. *See* 29 C.F.R. pt. 1630 app. § 1630.9; *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000).

"[I]nteractive process" is the label federal regulations and case law have given to this exchange of information, which often can facilitate the identification of an appropriate accommodation. *Ward*, 762 F.3d at 31; *see* 29 C.F.R. pt. 1630

app. § 1630.9. The interactive process, though, "is not an end in itself[.]" *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 347 (4th Cir. 2013) (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)). It is a means to the end of "determining what reasonable accommodations are available" that will allow a qualified individual with a disability "to perform the essential job functions of the position sought." *Id.* (quoting *Rehling*, 207 F.3d at 1016); *see Ward*, 762 F.3d at 31–32 (explaining that the need for and extent of information sharing varies from case to case).

Precisely because this process may be necessary to enable a reasonable accommodation, we have held that an employee that materially obstructs the informational exchange—for example, by withholding relevant medical information—cannot prevail on a failure-to-accommodate claim. *Ward*, 762 F.3d at 31–35; *Stewart*, 589 F.3d at 1306–1307. That is because an employer that is still reasonably waiting for information relevant to the formulation of an appropriate accommodation cannot be blamed for "not making [a] reasonable accommodation[]." 42 U.S.C. § 12112(b)(5)(A); *see Ward*, 762 F.3d at 31–35; *Stewart*, 589 F.3d at 1306–1307. For example, in Ali's previous lawsuit, we affirmed dismissal of his failure-to-accommodate claim because, after EPA requested "medical documentation" that would substantiate Ali's disability and allow EPA to evaluate accommodations, "Ali never provided the additional documentation that the EPA requested despite follow-up communication from" EPA. *Pruitt*, 727 Fed. App'x at 695–696. Ali thereby "abandon[ed] the interactive process," depriving EPA of information needed to offer an accommodation, and "never reengaged in [the informational exchange] before filing suit." *Id.* at 696.

In contrast, the record in this case does not establish that, as a matter of law, Ali frustrated the interactive process and

caused a breakdown in the employer-employee dialogue. And it certainly does not establish that Ali prevented EPA from offering a reasonable accommodation.

To start, Ali provided all the information that EPA requested of him. *See, e.g.*, J.A. 205 (noting that Ali provided additional medical information when "additional documentation was requested"). EPA nowhere argues that Ali withheld information needed to formulate an accommodation. Quite the opposite. EPA readily determined that Ali was a qualified individual with a disability and understood that a reasonable accommodation would have to address his workplace allergens. With all requested information in hand, EPA was able to formulate and to offer Ali what it evidently considered to be a reasonable accommodation: "[p]ermission to work at home full time." J.A. 208.

Where Ali and EPA disagree is whether EPA's proposed accommodation was reasonable. Ali's suit therefore turns on who is right about that question—not on some antecedent process failure.

In holding otherwise, the district court faulted Ali for his supposed "unwillingness to explain his rejection of the telework offer[.]" J.A. 269. There are two problems with this assignment of blame. First, whether Ali explained his rejection is a disputed material fact. The EEO Counselor who investigated Ali's complaint wrote that Ali *did* inform EPA that he could not work from home because printing at home, with the attendant exposure to printer chemical fumes, would exacerbate his symptoms. EPA Br. 28–29; *but see* J.A. 47 (Hawkins' statement that Ali "did not mention these reasons" to her).

Second, EPA never *asked* Ali whether he had additional reasons for rejecting telework. In fact, the record does not

indicate that EPA spoke with Ali at all about an appropriate accommodation between the time it determined he qualified for one and its proffer of the 100% telework accommodation. Instead, EPA presented its offer as an apparent *fait accompli*, without ever discussing with Ali the effectiveness or reasonableness of 100% telework for Ali's work. EPA did so despite having told Ali that it would "meet with [him] to explore and discuss what accommodation, if any, may be effective," and that it would make its accommodation offer only "[*a*]*fter* discussing this with you," J.A. 206 (emphasis added).

To be sure, nothing in the law obligated EPA to engage in an interactive process with Ali to the extent it was able to offer a reasonable accommodation without doing so. What matters here is that EPA's promise to work with Ali and then prompt breaking of that commitment does not remotely evidence, as a matter of law, that it was Ali who caused some sort of breakdown in the interactive process. And to the extent that EPA claims it needed more information from Ali, a reasonable jury could find, on this record, that it was EPA that jumped the gun by acting without discussing options in advance with Ali.

Notably, in subsequent communications, Ali repeatedly tried to reengage EPA in discussions about alternative accommodations. For instance, he followed up on June 28, July 5, and July 13, 2012, to reiterate his request for a private working space. EPA appears, on this record, not to have responded to any of these follow-ups. Later on, when Ali once again complained about a colleague's cologne triggering his allergies, a supervisor responded that "[y]ou have been offered a reasonable accommodation of 100% telework and have declined the offer." J.A. 241. That supervisor indicated a willingness to "reopen that discussion if [Ali] would like to reconsider" the telework offer, but not otherwise. J.A. 241. In

response, Ali expressed his eagerness "to discuss or settle the issues," J.A. 241, but there is no evidence that EPA replied to Ali's invitation for dialogue. A jury could reasonably conclude from this series of communications that EPA believed it had fully complied with all statutory obligations by offering Ali telework and that further conversation was unnecessary.

The dissenting opinion argues that EPA's failure to ask for Ali's reasons for declining telework is irrelevant because "it is the party who 'fails to communicate' and does not share information who bears the blame for breaking down the interactive process." Dissenting Op. 8 (quoting *Ward*, 762 F.3d at 32). But we have never previously affirmed summary judgment for the employer on interactive-process grounds where an employee failed to *volunteer* information, rather than provide requested information. *Contrast Ward*, 762 F.3d at 32–33 ("The interactive process broke down" when the employer "set forth in writing precisely the information it needed" and the employee "did not respond but instead resigned six days later"); *Stewart*, 589 F.3d at 1307–1309 (similar). This is especially true when it was the employer that broke its promise to talk with the employee—and so to hear the employee's views—before formulating a final accommodation proposal. After all, EEOC guidance contemplates that the employer "should" identify accommodations "[i]n consultation with the individual to be accommodated[.]" 29 C.F.R. pt. 1630 app. § 1630.9.

The dissenting opinion also argues that EPA's failure to engage Ali in further discussions before offering telework was reasonable because "EPA knew that Ali had asked to work from home in the past." Dissenting Op. 2–3. But the record suggests that Ali's prior work-from-home stint played no role in EPA's accommodation offer. Denise Hawkins—the supervisor who proposed Ali's permanent work-from-home

accommodation—averred that she did not "know of any time that Mr. Ali tried to telework," and that she "was not an EPA employee in March 2007," and so "ha[d] no knowledge of any actions taken or not taken at that time." J.A. 47, 49. Given that evidence, a reasonable jury could choose not to credit arguments by EPA that the accommodation proposed by Hawkins was grounded in the belief that permanent telework was a reasonable solution based on the 2007 experience.

In any event, this record does not establish as a matter of law that Ali failed to communicate, given evidence a reasonable jury could credit that he remained in near-continuous communication with supervisors, and it was the EPA that frequently failed to respond. In addition, Ali, after receiving EPA's accommodation offer, may reasonably have expected that EPA would make good on its same-day representation that Hawkins would reach out to him to "discuss what accommodation, if any, may be effective." J.A. 206.

Of course, EPA could rest on its offer of telework if that offer was reasonable as a matter of law within the meaning of the Rehabilitation Act. After all, "'[a]n employer is not required to provide an employee th[e] accommodation he requests or prefers[;] the employer need only provide some reasonable accommodation.'" *Aka*, 156 F.3d at 1305 (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)). But the consequence of making Ali a take-it-or-leave-it offer without first discussing it with him is that EPA, and not Ali, must bear the risk that evidence may show its offer was unreasonable. *See Deane*, 142 F.3d at 149 ("[A]n employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA."). For present purposes, our only point is that Ali's effort to reengage with EPA and EPA's brushing off of

those entreaties negates any inference that Ali was responsible for some kind of process failure.[5]

## B

### 1

EPA argues, in the alternative, that its 100% telework offer fully satisfied the Rehabilitation Act, as a matter of law, since the proposed accommodation was "plainly reasonable." EPA Br. 12–16, 22–33. That is also the primary ground on which the dissenting opinion would affirm. *Infra* at 1–6. But because a jury could find on this record that EPA's proposed accommodation was not reasonable, the district court's grant of summary judgment cannot be upheld on that basis.[6]

---

[5] The district court analogized "[t]he breakdown * * * in process * * * to what occurred in *Luolseged v. Akzo Nobel Inc.*, 178 F.3d 731, 732–737 (5th Cir. 1999)." J.A. 269. There, an employer withdrew a previously offered accommodation while offering alternative arrangements. *Id.* at 733–734. The employee "stayed silent, and quit." *Id.* at 738. The employee thereby failed to engage in the interactive process *at all*. As a consequence, the employee could not proceed with a failure-to-accommodate claim since there was no suggestion that the employer "would not consider *other* possible accommodations if [the employee] brought them to its attention." *Id.* at 739. *Luolseged* could not be more different from the situation here, where Ali repeatedly pressed other possible accommodations, while EPA refused to budge from its telework offer.

[6] The district court resolved the case only on the ground that Ali pretermitted the interactive process. This court, though, may affirm based on any ground preserved in the record, even if not relied upon by the district court. For that reason, we address EPA's

Deciding the reasonableness of a given accommodation not uncommonly involves context-based decisions ill-suited for summary judgment. *See Dean v. University at Buffalo Sch. of Med. and Biomed. Sciences*, 804 F.3d 178, 189 (2d Cir. 2015). As a result, "the same accommodation might be appropriate for one disability and inappropriate for another," or appropriate for one employee or one workplace and not for another. *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1335 (11th Cir. 2022) ("[T]he same disability may require different accommodations for different employees[.]"); *see also Jankowski Lee*, 91 F.3d at 896; *Turner v. Hershey Chocolate United States*, 440 F.3d 604, 614 (3d Cir. 2006); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994); *McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 855 (5th Cir. 1993); *Frye v. Aspin*, 997 F.2d 426, 428 (8th Cir. 1993); *Fuller v. Frank*, 916 F.2d 558, 562 n.6 (9th Cir. 1990).

Oftentimes, this kind of "fact-specific" question "must be resolved by a factfinder." *Noll v. IBM Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). Yet there may be cases where the undisputed evidence establishes that a proffered accommodation is so plainly effective as to permit summary judgment. *See Noll*, 787 F.3d at 93–94 (finding no issue of material fact where IBM offered a deaf employee "several accommodations[,]" including "ASL interpreters, * * * transcripts [of certain videos] upon request, and * * * [the ability to] view certain videos (such as the CEO's Annual Broadcast) with captioning" to be able to learn from training videos). But so long as sufficient evidence exists for a reasonable jury to find that a proposed accommodation is unreasonable, summary judgment

alternative argument. *United States ex rel. Health v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015).

on the basis of that accommodation is improper. *See Mogenhan*, 613 F.3d at 1165.

Here, there is sufficient record evidence to allow a reasonable jury to find that EPA's telework offer was not a reasonable accommodation for Ali. Ali testified below that he could "not print things" at home because he "get[s] allergic reaction[s] to emissions from printers[,]" and would have nowhere to go if that happened at home. J.A. 71. Ali also emphasized that, if he were absent from the office, he would not "be able to become a team leader" or "communicate with other people[,]" both of which are important to his job, which requires him "to be in touch with other people, talking to them, brainstorming and that sort of thing, and get some feedback from these people." J.A. 71. In addition, Ali pointed out that his home was "not suitable for working" there permanently because he lacked an "office space set up[.]" J.A. 71. Lastly, Ali expressed concern about the durability of such an arrangement because the last time he was allowed to work remotely in 2007, "[l]awyers got involved." J.A. 70–71.[7]

Given all that evidence, a reasonable jury could decide that 100% remote work would not "enable [Ali] to perform the essential functions of [his] position." 29 C.F.R. § 1630.2(o)(1)(ii).

Ali's concern that full-time remote work would prevent him from communicating with colleagues and becoming a team leader has particular salience under the Rehabilitation Act. Forcing an employee who was hired for an in-person position and who had successfully worked in-person for almost fifteen

---

[7] In Ali's prior lawsuit, he said that working from home had caused him to be "subjected to ridicule," with colleagues accusing him of "touring a foreign country" or being "on vacation." *Ali*, 179 F. Supp. 3d at 65.

years to switch to full-time telework as a condition of accommodating his disability may materially alter that employee's conditions of employment and prospects for equal work and advancement. These concerns sit at the heart of the Rehabilitation Act's aim of *integrating* disabled employees into the workplace and eliminating segregation and the stigma it creates. *See* 29 U.S.C. § 701(a)(3)(F) ("[D]isability is a natural part of the human experience and in no way diminishes the right of individuals to \* \* \* enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society[.]"); *id.* § 701(b)(2) (The Rehabilitation Act aims to "maximize opportunities for individuals with disabilities \* \* \* for competitive integrated employment[.]"); *Olmstead v. L.C.* ex rel. *Zimring*, 527 U.S. 581, 597 (1999) ("Unjustified isolation \* \* \* is properly regarded as discrimination based on disability."); *Allen v. Heckler*, 780 F.2d 64, 66 (D.C. Cir. 1985) (The Rehabilitation Act protects against "the continuing stigma" of having "at one time had a disability," which may persist even after medical treatment).

Recall that an employer's statutory obligation is to not "discriminate against a qualified individual on the basis of disability in regard to \* \* \* the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see* 29 U.S.C. § 791(f). One particular form of discrimination outlawed by the ADA and the Rehabilitation Act is to "limit[], segregat[e], or classify[] a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." *Id.* § 12112(b)(1); *see* 29 U.S.C. § 791(f). An employer cannot comply with its statutory obligation to reasonably accommodate a disabled employee by simultaneously violating the employer's statutory obligation to

avoid unreasonably limiting or segregating that same employee. *See Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1059–1060 (7th Cir. 1999) (Employer's offer that employee work alone at a new location was "unreasonable accommodation" that may violate ADA's prohibition on segregation.); *cf.* 29 C.F.R. Pt. 1630, App. § 1630.2(o) (Though reassignment to a different position may constitute a reasonable accommodation, "[r]eassignment may not be used to limit, segregate, or otherwise discriminate against employees with disabilities by forcing reassignments to undesirable positions or to designated offices or facilities."); *Wirtes v. City of Newport News*, 996 F.3d 234, 240–241 (4th Cir. 2021) ("[R]eassignment is the ADA's accommodation of 'last resort' and * * * should be held 'in reserve for unusual circumstances.'") (quoting *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1014 (4th Cir. 2020)).

Of course, remote work may well be a reasonable accommodation in many cases. *See* EEOC, Work at Home/Telework as a Reasonable Accommodation (Feb. 3, 2003), https://perma.cc/3CYS-RZ4A. But "[n]ot all persons with disabilities need—or want—to work from home." *Id.* Offering a willing employee a remote-work option is very different from forcing remote work on an unwilling employee as the sole option for accommodating that employee's disability. In the latter case, the factual record would have to justify the reasonableness of such forced segregation, such as by showing the absence of an integrative reasonable accommodation. *Cf. Duda*, 133 F.3d at 1059–1060 (Employee's claim "that he was forced to transfer to a new location and to work alone * * * is a clear claim of forced reassignment or of an unreasonable accommodation" for a disability); *Wirtes*, 996 F.3d at 241 ("[O]ther reasonable forms of accommodation [should] take precedence over reassignment" so as "keep[] [disabled employees] in their

present job[s] rather than "hurl[] them into an unfamiliar position.") (formatting modified).[8]

In short, whether proposed by the employer or requested by the employee, the reasonableness of telework cannot be presumed. Instead, like many accommodation judgments, the reasonableness of a telework accommodation turns on whether it will enable a specific employee "to perform the essential functions of [his] position" in a specific workplace, which will often be a fact-sensitive inquiry. 29 C.F.R. § 1630.2(o)(1)(ii); *see Owens*, 52 F.4th at 1335. The same principle applies to determining whether a telework accommodation will unreasonably segregate or limit that employee by virtue of his disability. *See* 42 U.S.C. § 12112(b)(1). As a result, requiring an employee who has successfully worked in the office for years to leave the workplace permanently as the sole means for accommodating a disability—without first discussing it with him or exploring integrative alternatives—risks running afoul of the Rehabilitation Act and ADA's integrative mandates, depending on the fact-specific record in each case.

Having said that, it always remains an employee's burden to establish that some reasonable accommodation exists. *Carter*, 840 F.2d at 65. As a result, an employee who objects to remote work will need to show the feasibility of some other option. *Id.* And an employer willing to offer remote work but not some other accommodation may show that another

_____

[8] The ADA and Rehabilitation Act also require employers to make reasonable accommodations so that a disabled job applicant could perform the job. 42 U.S.C. § 12112(b)(5)(B); 29 U.S.C. § 791(f). We need not address here whether imposing remote work as an upfront accommodation for a job applicant might differ from offering it as an accommodation to an employee already hired for and previously performing in an in-person position.

accommodation "would impose an undue hardship on the operation of [its] business[.]" 42 U.S.C. § 12112(a)(5)(A). There may therefore be cases where the absence of a feasible integrative accommodation makes remote work a reasonable option, even if the employee objects to it. All we decide here is that, at the summary-judgment stage and on this record, Ali met his burden to come forward with sufficient evidence showing that remote work was not a reasonable option.[9]

The dissenting opinion reasons that, because Ali worked from home for several months in 2007, EPA's 2012 permanent telework offer must have been reasonable. *See infra* at 2–5. We agree that a reasonable jury could accept that argument. But we disagree that it must do so as a matter of law on this record. Specifically, whatever the circumstances that allowed Ali to work from home for a few months five years earlier, they do not, as a matter of law, negate Ali's evidence that, as of 2012, (i) he lacked an adequate home-office set-up, (ii) printing would be a health problem, and (iii) working from home would

---

[9] As to the existence of reasonable alternatives, Ali represented below that various private spaces were available in which he could work, while EPA maintains that office spaces were not available. Similarly, EPA introduced an air-quality assessment showing "no appreciable difference between the quality of air in an office and in a cubicle," J.A. 103, while Ali's doctor suggested that Ali could "limit his occupational exposure to all allergens [by working] in an isolated office environment," J.A. 206. Those factual disputes are for a jury to resolve. The dissenting opinion would resolve them now, suggesting that allergens throughout the office or on Ali's commute would prevent him from working as effectively there as he could at home. *Infra* at 1–2. But that conclusion ignores that Ali worked successfully in EPA's shared office space for four years, until EPA chose to locate an employee known throughout the office for his powerful perfumes right next to Ali.

compromise his ability to communicate and brainstorm with colleagues.[10]

Nor does the record demonstrate that the 2007 telework stint was undisputedly successful or replicable. Ali testified that, in 2007, he was "able to manage" telework for a relatively "short" period. J.A. 174–175. Then too, he lacked "an office set up," but nonetheless made do by putting a computer on a table "because [he] didn't have any option." J.A. 174. Importantly, Ali also testified that he "didn't have a lot of work" in 2007, but that he does "nowadays." J.A. 175. And EPA ultimately required Ali to return to the office, casting doubt on whether telework actually allowed Ali to perform his job effectively in 2007.

**2**

EPA asks us to ignore Ali's testimony enumerating many reasons why EPA's proposed telework accommodation was not reasonable on the ground that these "post-hoc concerns" were not communicated to it before this litigation. EPA Br. 28–32. This argument fails for two reasons.

First, nothing in the Rehabilitation Act or precedent imposes a duty on the individual with a disability to turn over

---

[10] The dissenting opinion argues that EPA did not offer Ali a "permanent telework" accommodation, but rather a "flexible" mix of in-person and telework as needed. Dissenting Op. 5. But EPA itself repeatedly referred to its accommodation as involving "[p]ermission to work at home full time," J.A. 208, "100% working from home," J.A. 54, or "100% telework," J.A. 241. In any event, the fact that EPA now says that it would have allowed Ali *to work* in the office occasionally says nothing about its willingness *to accommodate* his disability in the office. On that point, its sole accommodation offer remained work-from-home.

each piece of evidence before litigation or else lose the chance to use it. If EPA sought to elaborate the grounds for its rejection of Ali's proposed private-office accommodation, it could of course introduce evidence beyond what it communicated to Ali before litigation—like its litigation argument that the temporary telework in 2007 supported the reasonableness of the accommodation. We see no reason why Ali should be held to a different standard.

Keep in mind too that, during the workplace-accommodation process, employees with disabilities rarely proceed with lawyers in tow. The process is meant to be "informal" and constructive. *Ward*, 762 F.3d at 32 (quoting 29 C.F.R. § 1630.2(o)(3)). Employees may not understand at this early juncture what additional information is needed from them, much less that they should spontaneously offer information that the employer never requested. Especially in a case like this, where the employer elected to offer its proposed accommodation without engaging the employee in discussions as it had promised to do. Further, some of Ali's reasons for why 100% telework might not constitute a reasonable accommodation—a compromised ability to work with teammates or to take on leadership roles—involve fairly commonplace concerns that EPA does not claim surprised it.

Of course, as noted earlier, an employee who renders their employer unable to offer a reasonable accommodation by withholding necessary information or concealing relevant facts can hardly complain of being denied one. *See Ward*, 762 F.3d at 32. But EPA's argument on its alternative ground for affirmance is about the reasonableness of its proffered accommodation as a matter of law, not a breakdown in the interactive process.

EPA may ultimately convince a jury that its 100% telework offer was reasonable. But, given the evidence in this case, EPA has given us no reason to hold that a jury could not conclude otherwise.

Second, and in any event, there is record evidence that Ali communicated at least one of his concerns regarding EPA's proposed telework accommodation to EPA. During his interview with an EEO counselor, Ali told the counselor that he had told Ms. Hawkins "that the telework option would not work because if he had to print [at home] then his symptoms would get worse." EPA Br. 28–29. Hawkins maintains that Ali did not tell her as much. Resolution of that fact dispute is for juries, not for summary judgment.

EPA responds that this evidence is irrelevant because (1) Ali's specific disability involved allergic reactions to a co-worker's perfume rather than printer fumes; (2) Ali did not show he needed to print at home; and (3) EPA could have found ways to accommodate any printing needs consistent with Ali's working remotely. EPA Br. 29–30. None of these arguments allows resolution of this case at summary judgment.

On the first point, EPA itself recognized Ali's disabling allergies are triggered by "exposure to various kinds of allergens that include not only environmental allergens but also volatile organic compounds and products like paint, petroleum derivatives, perfumes, any kind of fragrances or odors, and several other materials." J.A. 206. In fact, a report EPA commissioned identified "copiers and printers" as one source of "volatile organic compounds." J.A. 219–220. And EPA *agreed* with Ali's doctor's recommendation that Ali should "limit his occupational exposure to all allergens in an isolated office environment." J.A. 206. Ali's complaints that led to EPA's accommodation offer also specifically identified

"fumes from printers" as a "toxic" irritant. J.A. 236. That all adds up to record evidence that would allow a reasonable jury to conclude that the disability recognized by EPA included exposure to printer fumes.

As for the second point, EPA's argument that Ali introduced no evidence he would need to print at home is flatly contradicted by EPA's own evidence. Ali's supervisor, Denise Hawkins, told an EEO counselor that "Ali would need to print articles from the Internet whether he worked at home or at the office." J.A. 47. She also stated that EPA was willing to provide Ali a home printer if he lacked one, further rebutting any inference that Ali did not need to print as part of his regular job duties.[11]

On EPA's third argument, perhaps EPA could have found ways to solve any printing problem—but perhaps not. The record is not conclusive either way. Since we must draw all reasonable inferences in Ali's favor at this stage, EPA's argument about unoffered and unexamined alternatives cannot support summary judgment in its favor.

In short, Ali adduced ample evidence that would allow a reasonable jury to find that 100% telework was not a reasonable option, including evidence that it would isolate him at work and prevent him from collaborating with colleagues, as well as evidence about potential inadequacies and health hazards in any work-from-home setup. There is evidence that

---

[11] While Ali would also need to print at work, Ali testified at his deposition that, when in the office, he had been able to print files "far away" from his desk, and that printing at home would not provide that option. J.A. 89–90. It is therefore not the case that Ali "offered no plausible reason why he would have fared better if he was printing from a private office." Dissenting Op. 3. Ali in fact offered an explanation that a reasonable jury could credit (or not).

Ali communicated at least one of these concerns to EPA prior to the lawsuit, and the remainder are sufficiently evidenced to be presented to a jury. Accordingly, EPA's 100% telework offer was not so plainly reasonable as to overcome all of the disputed material facts in the record and allow summary judgment in EPA's favor.

**3**

EPA finally suggests that we may affirm because "Ali effectively accepted EPA's initial, informal offer of a reasonable accommodation in the form of changing cubicles." EPA Br. 16. EPA argued in the district court that Ali "rejected" that very same accommodation. Motion for Summary Judgment (ECF.19) at 7. EPA's argument is therefore forfeited. *See Elliott v. United States Dep't of Agriculture*, 596 F.3d 842, 851 (D.C. Cir. 2010 ("[W]e will not consider for the first time on appeal arguments that a [party] entirely failed to raise in the trial court."); *Krieger v. Fadely*, 211 F.3d 134, 135 (D.C. Cir. 2000).

In any event, there is record evidence that EPA proposed changing cubicles as only a temporary solution. One of Ali's supervisors offered that option following Ali's initial complaint as "an immediate remedy" meant for "the mean time[,]" while EPA "implement[s] a permanent solution." J.A. 235. Beyond that, Ali repeatedly tried switching cubicles and explained that doing so did not solve his problem. J.A. 236. There is accordingly record evidence that would allow a reasonable jury to conclude either that EPA never formally offered cubicle-switching as its permanent reasonable accommodation or that any such offer was not a reasonable accommodation in the circumstances of this case.

**V**

After determining that Ali had a qualifying disability, EPA offered Ali a 100% telework option that a jury might or might not find reasonable. The central question in this case, in other words, turns on a quintessential factual dispute that needs to be resolved by a jury. While EPA and Ali might have explored other accommodation options, we cannot conclude as a matter of law that any failure to do so rested solely on Ali or that Ali's conduct prevented EPA from formulating a reasonable-accommodation proposal.

For all of the foregoing reasons, we reverse the district court's grant of summary judgment to EPA and remand for further proceedings consistent with this opinion.[12]

*So ordered.*

---

[12] This court appointed Daniel S. Volchok of Wilmer Cutler Pickering Hale and Dorr LLP to present arguments in favor of Ali's position. He was assisted on the briefs by Amy Lishinki, Julie Aust, Allison Schultz, and Joshua Feinzig, also of Wilmer Hale. We thank each of them for their able assistance in presenting this case.

RANDOLPH, *Senior Circuit Judge*, dissenting:

I would uphold the district court's grant of summary judgment in favor of the Environmental Protection Agency.

With several "ifs" and "buts," the Rehabilitation Act requires federal agencies to adapt the working conditions of its qualified, but disabled, employees. 29 U.S.C. § 791(f); 42 U.S.C. § 12112(a), (b)(5)(A). Ghulam Ali, an economist working at EPA, sought among other relief $300,000 in damages, claiming that EPA violated those provisions.

The material facts are these. Ali began working at EPA in 1997. In 2011, he told his supervisors that a colleague's cologne was causing him to experience allergic reactions. He formally requested to be moved to a private office in early 2012. EPA instead offered to let Ali work from home. Ali rejected that offer. Because the evidence shows that EPA's proposed arrangement would have enabled Ali to "perform the essential functions of [his] position," EPA was entitled to summary judgment. 29 C.F.R. § 1630.2(o)(1)(ii); *see* 42 U.S.C. § 12111(8).

EPA determined that Ali needed an accommodation because he suffered "detrimental effects on [his] health" from "exposure to various kinds of allergens." The agency accepted Ali's doctor's suggestion that he "limit his occupational exposure to all allergens in an isolated office environment." In EPA's building, however, the shared HVAC system made air quality largely identical everywhere. And even if Ali had a private office, he would need to take public transportation to get to the office and then regularly pass through heavily trafficked common areas, bathrooms, hallways, and elevators. In such settings, Ali would have no way to avoid encountering allergens. For these reasons, EPA proposed that Ali work at home where he would have "more control" over the air quality.

Ali had already worked from home in the past. In 2007, EPA authorized Ali to telework for approximately six months after he experienced an allergic reaction. In his deposition, Ali testified that he "was able to work from home" and "sustain [him]self during that time period"—in other words, that he "was able to manage it." He also testified in an administrative proceeding that working from home "became pretty nice." In fact, Ali found it so "nice" that, when ordered to return to the office, he filed a complaint with the Equal Employment Opportunity Commission claiming that EPA was failing to accommodate him by *refusing* to allow him to keep working from home. Ali cannot dispute that EPA reasonably accommodated him in 2007 by letting him work remotely.[1]

So why was EPA's identical work proposal no longer reasonable in 2012? Ali has no rational answer and neither does the majority opinion. The mere fact that Ali had more work to do in 2012 does not by itself explain how or why completing that work at home would have been unreasonable in ways that it had not been five years earlier.

In 2012, as in 2007, Ali would have been able to perform the essential functions of his position while working from home. Had he worked remotely, he would have avoided the "detrimental [health] effects" from allergens in the office that led to his accommodation request. And EPA knew that Ali had

---

[1] The majority opinion points to Ali's claim in an earlier lawsuit that his coworkers "ridicule[d]" him for working from home in 2007. Majority Op. 24 n.7 (citation omitted). That unsubstantiated allegation cannot be used at the summary-judgment stage. *See Durant v. D.C. Gov't*, 875 F.3d 685, 697 (D.C. Cir. 2017).

asked to work from home in the past.[2]  Teleworking thus promised to "address" and "mitigat[e]" the challenges Ali faced as a result of his disability by reducing his risk of exposure to allergens. *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 238 (D.C. Cir. 2018).  That is exactly the kind of reasonable accommodation that the law demands. *See id.*

Ali claims that there were enough downsides to EPA's proposal that a jury should get to decide whether it was reasonable.  But none of these alleged downsides is sufficient to create a genuine issue of material fact.  For example, Ali testified that he "didn't want to take a chance on" remote work again given the dispute he previously had over returning to the office.  That is a complaint about the accommodation process, not a claim that he could not have carried out any of his duties from home.

Ali's most substantial argument about why telework was inadequate is that he would be unable to print materials from home lest he experience an allergic reaction to emissions from the printer.  But Ali offered no plausible reason why he would have fared better if he was printing from a private office.  That failure is critical.

Ali claimed that printer fumes in the office repeatedly caused him to suffer adverse reactions.  He regularly needed to go to the printer to collect materials he had printed.  Moving him to a private office would not have changed that.  His cubicle was already located "far away" from the printers.  So Ali's risk of

---

[2] Ali's immediate supervisor in 2012 testified that she was not aware of the events of 2007.  But she formulated EPA's offer with "input" from and in coordination with the director of Ali's division, who believed that remote work was the "best option" in part because she knew of Ali's prior desire to work from home.

exposure to printer emissions if he had a private office would have been the same as, or perhaps even greater than, if he had worked from home. And Ali would have had more flexibility at home to control the location of the printer.[3]

His remaining objections have even less force. Ali did not explain how or why telework would inhibit his career development and communication with coworkers in 2012, but not in 2007. *Cf. Doak v. Johnson*, 798 F.3d 1096, 1107 (D.C. Cir. 2015). It is true that remote work has the potential to isolate employees from their colleagues. *See, e.g.*, *Langon v. Dep't of Health & Hum. Servs.*, 959 F.2d 1053, 1060 (D.C. Cir. 1992). But, again, Ali had already worked from home for an extended period and yet he identified no professional setbacks he experienced as a result. To the contrary, at that time he opposed EPA's efforts to bring him back into the office and insisted that he wanted to keep working from home. And Ali's own proposal—working out of a private office in a different division—also would have physically isolated him from his colleagues in the building.

Similarly, Ali's insistence that his home's lack of a designated office space made it unsuitable for telework falls short in light of his prior experience. He admitted that he "manage[d]" to work without a formal office setup for many months by setting up a table with a computer in his living room. Ali described that experience as "pretty nice" and made it clear to EPA at the time that he wanted to keep that arrangement. His later and unexplained change of heart cannot create a genuine

---

[3] The majority opinion credits Ali as testifying that he would not be able to print "'far away' from his desk" at home. Majority Op. 32 n.11 (quoting J.A. 89–90). But Ali never testified that he would be unable to situate a printer far from his home work area.

dispute of fact. *Cf. Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007).

Even if working from home on a longer-term basis may have presented different challenges than his prior stint, Ali never articulated as much. He also never discussed with EPA the particulars of what working from home would entail. So Ali "cannot benefit from this uncertainty" by assuming that EPA would not have found ways to help him telework effectively. *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 472 (5th Cir. 2009). EPA told Ali that it was amenable to "consider[ing] other accommodations" if full-time remote work did not prove to be effective. For instance, EPA was "willing to buy [Ali] a printer or any other equipment that he needed so that he could do his job." And Ali was informed that EPA was "completely flexible" on allowing him to work in-office some of the time. To frame EPA's proposal as only offering Ali "permanent telework," as the majority does, Majority Op. 3, 20–21, 27–28, obscures EPA's willingness to tailor the work-from-home accommodation to Ali's needs.

In any event, Ali was entitled to a reasonable accommodation, not a "perfect" one. *Noll v. IBM Corp.*, 787 F.3d 89, 95 (2d Cir. 2015). EPA did not bear the responsibility of "alleviating any and all challenges" Ali's disability presented. *Hill*, 897 F.3d at 238. Nor was Ali entitled to refuse to work from home unless he was given a "state-of-the[-]art" home office setup. *See* 29 C.F.R. pt. 1630 app. § 1630.9. The majority opinion uncritically credits most of Ali's complaints about EPA's offer as sufficient to create doubt about whether the offer was reasonable.[4] But the majority opinion nowhere

---

[4] Ali's last objection—which the majority sensibly ignores—is that his wife did not "want [him] to work at home." In the face of repeated questioning, Ali would not give a single reason for his wife's

explains why the only other option on the table—a private office—would have been reasonable in light of its logistical complications and conjectural benefits. Work from home may not have been everything Ali desired, but any reasonable jury would find that EPA satisfied its duty under the Rehabilitation Act to extend Ali a reasonable accommodation.

Because EPA's offer was reasonable, it is irrelevant that Ali would have preferred a private office. An employer need not provide an employee's "request[ed] or prefer[red]" accommodation but must only "provide *some* reasonable accommodation." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc) (emphasis added) (citation omitted). The employer has "ultimate discretion" to select its preferred reasonable accommodation. 29 C.F.R. pt. 1630 app. § 1630.9. If one option is "less expensive," for example, or "easier . . . to provide," the employer is free to select it for that reason. *Id.* EPA rejected Ali's request for a private office because none was available in his division. That was reason enough for EPA to insist on its own, reasonable proposal. It had no duty to determine whether other EPA divisions elsewhere in the building had vacant offices or to evict another employee from his or her office to make room for Ali. *See* 29 C.F.R. § 1630.9(d); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999) (en banc).

That suffices to resolve this case. As the district court rightly held, however, the so-called interactive process provides an additional basis for granting EPA summary judgment.

An interactive process between employer and employee "may be necessary" to discuss the nature of the employee's

---

opposition. If Ali cannot veto an otherwise reasonable accommodation, *see infra*, then neither can his wife.

disability and identify potential accommodations. 29 C.F.R. § 1630.2(o)(3). The process is not itself a ground for holding liable an employer that has offered the employee a reasonable accommodation. *See Brigham v. Frontier Airlines, Inc.*, 57 F.4th 1194, 1201 (10th Cir. 2023) (collecting cases). But the interactive process does matter if the employee causes the process to break down. *Ward v. McDonald*, 762 F.3d 24, 31–35 (D.C. Cir. 2014). An employer has not failed to "mak[e] reasonable accommodations," 42 U.S.C. § 12112(b)(5)(A), if the employee abandoned the process before a resolution could be reached or did not engage in the process in good faith.

That describes this case. EPA acted reasonably in working with Ali to find a suitable accommodation, but then Ali short-circuited the interactive process. The same day Ali informed EPA officials that he had an allergic reaction, one of them offered him the "immediate remedy" of relocating to a different cubicle. Another helped him prepare and submit a formal accommodation request. And when Ali provided stale and vague medical documentation, his supervisor gave him the opportunity to submit more detailed information. EPA then extended him an accommodation offer—the precise "end" that the interactive process is meant to achieve. *Sansone v. Brennan*, 917 F.3d 975, 980 (7th Cir. 2019).

In response, Ali delivered a handwritten note that said, "I thought about working from home. It is not a good option." The note offered no explanation but simply reiterated his demand for a private office. Once Ali rejected the offer, EPA "was not . . . required to extend another" or to negotiate further. *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1013 (4th Cir. 2020).

Even so, EPA continued to try to help Ali. It asked Federal Occupational Health to conduct an air-quality assessment in a

private office and Ali's cubicle. It turned out that both locations had similar and acceptable levels of various chemicals, volatile organic compounds, and fungi. This indicated to EPA that there was "no appreciable difference" in air quality between a cubicle and an office.

EPA also explored other ways to alleviate Ali's symptoms. Management extended him a "standing offer" to move to another cubicle, and so he tried a number of different cubicles until he settled on one that he preferred. He was also offered an air filter for his cubicle, which he declined.

These active and persistent efforts to understand Ali's medical condition, help him through the accommodation process, and then seek to find a reasonable solution "bore all the hallmarks of good faith" on EPA's part.[5] *Ward*, 762 F.3d at 34. Ali, by contrast, rejected multiple suggestions without any explanation and thus "obstructed the process." *Id.* at 32 (citation omitted).

The majority faults EPA because it "never *asked* Ali" why he rejected the telework offer. Majority Op. 18. But it is the party who "fails to communicate" who bears the blame for breaking down the interactive process. *Ward*, 762 F.3d at 32 (citation omitted). One side cannot stay silent and sit on relevant information, even if the other side has not specifically requested that information. *See EEOC v. Methodist Hosps. of Dall.*, 62 F.4th 938, 950 (5th Cir. 2023); *Kvorjak v. Maine*, 259

---

[5] Although EPA's letter recognizing Ali's disability suggested that his supervisor would meet with him to discuss the situation before offering an accommodation, it seems that no such discussion happened before EPA sent Ali its telework offer that same day. Even so, Ali made no mention of wanting a meeting (much less of expecting one) when he responded to EPA's offer by rejecting it out of hand.

F.3d 48, 53–54 & n.11 (1st Cir. 2001); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1072–73 (7th Cir. 1998). Only Ali could say why work from home was not to his liking, but he chose to keep that knowledge to himself instead of sharing it with EPA to keep the process going. EPA therefore was not obligated to probe beyond Ali's unexplained and emphatic rejection of the remote work offer.[6] *See Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 333 (3d Cir. 2003); *Hypes ex rel. Hypes v. First Com. Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (per curiam).

Ali cannot show that EPA denied him a reasonable accommodation, so I would affirm the district court's order granting EPA summary judgment.

---

[6] Ali and EPA dispute whether he informed EPA of his concerns about being able to print from home. Even if he raised the issue at some point before filing suit, there is no indication that he did so in conjunction with his note turning down EPA's offer.